COMMONWEALTH vs. PAUL J. CIARAMITARO
(and five companion cases [1]).

No. 87-1190.

Essex. March 16, 1988. — June 13, 1988.

Present: BROWN, KAPLAN, & WARNER, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry, Probable cause.
*Threshold Police Inquiry. Constitutional Law,* Search and seizure, Prob-
able cause. *Evidence,* Admissions and confessions.

Where it appeared from a judge's findings, with amplification from the
record at a suppression hearing, that a police officer, an experienced
investigator of traffic in controlled substances, received information
from two informants, of whom each was known to the officer but un-
known to the other and, acting independently, gave the officer essentially
corroborating statements in detailed respects that two individuals (defend-
ants) were going to New York City to purchase heroin; that one of the
informants had previously provided the officer with reliable information;
that the defendants were known to the officer as having been involved
in narcotics offenses; that the officer's surveillance confirmed the tips
in significant predictive respects; that the defendants' movements, con-
sidered cumulatively, were consistent with the purpose described by the
informants; and that the officer and a fellow officer stopped the defend-
ants' automobile on its return to Massachusetts, advised its occupants
of their Miranda rights, ordered them out of the vehicle and conducted
pat frisks and, after the defendants' companion made statements that
the automobile contained heroin and produced several bags of heroin
from within her body, searched the vehicle and seized bags of heroin
and a hypodermic syringe, this court concluded that the officers' actions
in stopping the vehicle and detaining its occupants were justified as a
threshold inquiry governed by the principles articulated in *Terry* v. *Ohio,*
392 U.S. 1 (1968), up until the defendants' companion's statements and
production of the heroin, which then resulted in and justified the seizure
of the heroin from the automobile. [113-116]

---

[1] Two of the companion cases are against Paul J. Ciaramitaro and three
are against Louis A. Catalina.

INDICTMENTS found and returned in the Superior Court Department on June 18, 1986.

Motions to suppress evidence were heard by *Walter E. Steele,* J.

The cases were reported to the Appeals Court by *Joseph R. Nolan,* J., following his allowance of the Commonwealth's application for an interlocutory appeal in the Supreme Judicial Court for the county of Suffolk.

*Judith Fabricant,* Assistant District Attorney, for the Commonwealth.

*Edward J. O'Reilly* (*David A. Whynott* with him) for the defendant.

WARNER, J.  The defendants were each indicted for possession with intent to distribute heroin, conspiracy to violate the controlled substance law, and possession of a hypodermic needle and syringe. This is the Commonwealth's appeal from an order of a Superior Court judge allowing the defendants' motions to suppress. The appeal was allowed and referred to this court by a single justice of the Supreme Judicial Court. See Mass.R.Crim.P. 15(b)(2), 378 Mass. 884 (1979).

We draw the essential facts from the judge's findings with amplification from the record. On October 19, 1985, at about 11:00 A.M., Sergeant David Reardon, an experienced narcotics investigator with the Gloucester police department, received a telephone call from a confidential informant (A). A told Reardon that the defendants were planning a trip to New York City to purchase heroin. A had not provided information before, but he was known to Reardon. The defendants were known to Reardon as he had arrested them for narcotics violations several times in the past.

As promised, A called Reardon again at approximately 1:00 P.M., on October 19. This informant then told Reardon that the defendants had conferred about approaching one Michelle Frasier (who was known to Reardon) to request that she help finance the heroin purchase. He also told Reardon that the heroin would be marked "poison" and that the defendants would be travelling by automobile, leaving at around midnight that night. In a third call at about 3:00 P.M. on October 19, A informed

Reardon that Frasier had agreed to put up $1,000 but not "up front"; she would go with the defendants to buy the heroin.

Between 10:00 and 11:00 P.M. on October 19, Reardon received a call from a second confidential informant (B). B was known to Reardon and had given information several times previously which led to the arrest and conviction of people in Gloucester, including the defendants, on charges involving possession of heroin.[2] B told Reardon that the defendants were going to New York City that night at about midnight to buy heroin. The defendants would travel in an automobile belonging to the defendant Ciaramitaro's mother, a green Pontiac bearing Massachusetts registration number 119EAX. Reardon was familiar with this vehicle.[3]

Following receipt of the tips, Reardon went in his own automobile to the vicinity of Ciaramitaro's home in Gloucester. There he saw the green Pontiac in the driveway. Shortly after midnight, the defendants came out of the house, entered the Pontiac and drove to another location in Gloucester where they picked up Frasier. The Pontiac then proceeded to Route 128 south. Reardon followed as far as Beverly, a distance of about fifteen miles.

In the early morning of October 20, 1985, a plan was developed by Reardon and State and local police officers to stop the Pontiac on Route 128 in Danvers during what was expected to be the return trip from New York. To that end, the State police were asked to advise when the Pontiac was spotted on the Massachusetts Turnpike. Thereafter, the officers were informed that the Pontiac had been seen entering the turnpike at Sturbridge. Soon the Pontiac was observed, occupied by the defendants and Frasier, travelling north on Route 128. A chase ensued (we omit insignificant detail) and ended when the Pontiac came to a stop at a traffic island at the end of an exit ramp.

---

[2] A and B did not know each other, and each was unaware the other was giving information to the police.

[3] Reardon was also told by one of the informants (he did not specify which) that the defendants expected to return to Gloucester on October 20 between 10:00 A.M. and noon.

Reardon and another officer approached the Pontiac, gave Miranda rights to the defendants and Frasier, which they said they understood, ordered them out of the car and conducted pat frisks. The defendant Catalina asked Reardon why they had been stopped. Reardon responded that the three had gone to New York to buy heroin. After initial denial by Catalina, the three said that they had been "ripped off" in New York, with Frasier adding that $1,000 of the money lost had been hers. Frasier was separated from the defendants and, on questioning by Reardon, she said that Catalina told her that he had been able to save some of the heroin purchased in New York. She told Reardon that there were four bags and a hypodermic needle in the front seat area of the Pontiac, and she produced five bags of heroin, four of which were marked "poison," from her vagina. The Pontiac was thereafter searched, and the police found underneath the dashboard twenty-eight bags of heroin marked "poison" and a hypodermic needle and syringe.

The judge ruled that the police lacked probable cause to search the Pontiac because each of the informants failed to satisfy one prong of the *Aguilar-Spinelli*[4] test. See *Commonwealth* v. *Upton*, 394 Mass. 363 (1985). A, the judge concluded, did not meet the veracity standard and B fell short on the basis of knowledge requirement. See *id.* at 375. The deficiencies, the judge said, were not remedied by independent police corroboration. See *id.* at 376. Further, the judge ruled that the stop was not justified under the holding of *Terry* v. *Ohio*, 392 U.S. 1 (1968), because the automobile was not operated "in such a way as to suggest that a crime was committed, was being committed or was about to be committed."

" [T]he ultimate legal conclusion to be drawn from the fact[s] developed at the hearing [on the motion to suppress] is a matter for our review, particularly where the conclusion is of constitutional dimension." *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n. 18 (1980). We do not reach the question whether the police had probable cause to stop and search the Pontiac

---

[4] *Aguilar* v. *Texas,* 378 U.S. 108 (1964). *Spinelli* v. *United States,* 393 U.S. 410 (1969).

at the outset because, on quite different analysis from that employed by the judge, we hold that there was a valid basis for a *Terry* stop and probable cause for the subsequent search of the automobile.[5]

"In *Terry* [the Supreme] Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' [392 U.S.] at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.*, at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Id.* at 21-22." *Adams* v. *Williams*, 407 U.S. 143, 145-146 (1972). The strict two-pronged test of *Aguilar-Spinelli* with respect to informants' tips, which must be met in order to support an arrest or search warrant, does not have to be satisfied in order to justify a threshold inquiry as long as the information conveyed has "indicia of reliability." *Id.* at 147. *Commonwealth* v. *Anderson*, 366 Mass. 394, 397-398 (1974). In *Adams* v. *Williams*, *supra* at 147, "the court veered away from the two-pronged test for threshold inquiries based on an informant's tips, emphasizing that while an unverified tip may not suffice for arrest or warrant it may carry enough 'indicia of reliability' to justify a threshold inquiry. The *Adams* case does not lay down any definite test in these situations, pointing out that tips may vary in reliability and that no one rule can supply all the

---

[5] The judge's finding, on somewhat conflicting evidence, that the arrests of the defendants and Frasier occurred after the search of the automobile has adequate support. The defendants' one sentence conclusory assertion in their brief that the arrests took place at an earlier time does not rise to the level of appellate argument, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and we do not consider it.

answers." *Commonwealth* v. *Anderson, supra* at 398.[6] The test is one of reasonableness.

We conclude that the information in the hands of the police had sufficient indicia of reliability to justify the stop of the Pontiac and the detention of its occupants. The informants, both of whom were known to Reardon but unknown to each other and acting independently, gave essentially corroborating statements in detailed respects. Cf. *Commonwealth* v. *Nowells,* 390 Mass. 621, 624-627 (1983). Both defendants were known to Reardon as having been involved in criminal offenses arising out of the possession of heroin. B's previous information had led to the arrest and conviction of both defendants on heroin charges. Reardon's surveillance confirmed the tips in significant predictive respects. The movements of the defendants and Frasier, considered cumulatively, were consistent with the purpose described by the informants. In sum, we think the stop and the threshold inquiry in this case were justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." *Terry* v. *Ohio, supra* at 21. See *Adams* v. *Williams, supra* at 146; *Commonwealth* v. *Anderson, supra* at 397-399; *Commonwealth* v. *Cantalupo,* 380 Mass. 173, 174-176 (1980); *Commonwealth* v. *Wren,* 391 Mass. 705, 707-708 (1984); *Commonwealth* v. *Blake,* 23 Mass. App. Ct. 456, 459 (1987). The statements made to the police by the defendants and Frasier during the threshold inquiry, and after Miranda warnings had been given, should not have been suppressed.[7]

---

[6] In this case, the judge seems incorrectly to have assumed that a *Terry* stop may only be made on the basis of the personal observations of police. See *Adams* v. *Williams, supra* at 147.

[7] The judge's comments about the failure of the police to obtain a search warrant when there was, in his view, adequate opportunity to do so are curious. The judge ruled that the information which the police had at the time of the stop was insufficient to satisfy the probable cause standard. In any event, the pieces of the adventure did not fully fit until there was a report that the Pontiac had entered the Massachusetts Turnpike at Sturbridge, information which came very shortly before the automobile was spotted by the police on Route 128. Compare the discussion of anticipatory search warrants in *Commonwealth* v. *Soares,* 384 Mass. 149, 153-155 (1981); *Commonwealth* v. *Douglas,* 399 Mass. 141, 144-145 (1987).

The statements made by Frasier and the bags of heroin which she produced from within her body, standing alone, provided probable cause for the subsequent search of the automobile. The evidence then seized should not have been suppressed.[8]

*Order allowing motions to suppress reversed.*

---

[8] We do not reach the defendants' one-page argument that the police officers who made the arrest lacked territorial jurisdiction to do so. The judge made no findings or rulings on the question; the Commonwealth sought appellate review only of the judge's determination of lack of probable cause; and our review of the suppression hearing transcript reveals factual issues which should be resolved in the first instance by a Superior Court judge.