COMMONWEALTH *vs.* KEVIN ILGES.

No. 04-P-212.

Essex. January 5, 2005. - September 14, 2005.

Present: LENK, COWIN, & GRAHAM, JJ.

*Controlled Substances. Practice, Criminal,* Warrant, Affidavit. *Search and Seizure,* Warrant, Affidavit, Protective frisk, Probable cause. *Constitutional Law,* Stop and frisk. *Probable Cause.*

A warrant to search a criminal defendant's apartment was based on sufficient interlocking details in confidential informant statements, supplemented by police corroboration, to establish probable cause. [508-513]

A traffic stop of a criminal defendant was lawful in circumstances where the police had, at the very least, a reasonable suspicion that the defendant was then engaged in criminal activity, and although the subsequent patfrisk that disclosed a certain sum of cash was improper, the evidence was admissible where the police had, at the time of the stop, probable cause to arrest — and therefore a corresponding right to search — the defendant. [513-516]

INDICTMENTS found and returned in the Superior Court Department on October 28, 1998.

Pretrial motions to suppress evidence were heard by *Christine M. McEvoy,* J., and *Nonnie S. Burnes,* J., and the cases were tried before *Peter W. Agnes, Jr.,* J.

*James E. McCall* for the defendant.

*James A. Janda,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant, Kevin M. Ilges, was convicted by a jury of trafficking in 100 grams or more of cocaine, G. L. c. 94C, § 32E; trafficking in cocaine within 1,000 feet of a school zone, G. L. c. 94C, § 32J; and unlawful possession of hydrocodone, a class C controlled substance, G. L. c. 94C, § 34. Prior to trial, he filed three motions seeking suppression of statements and other evidence obtained by the police pursuant to what he alleges is a search warrant issued without probable cause, an unlawful stop,

and Miranda violations. The motions were denied in separate decisions by two Superior Court judges, and the defendant complains that two of the denials were erroneously entered.[1] We conclude that the warrant to search the defendant's home was based on sufficient interlocking details in confidential informant statements, supplemented by police corroboration, to establish probable cause. We determine also that the traffic stop and the seizure of evidence at that time were permissible, although we do so on grounds other than those chosen by the motion judge.

1. *Material facts and proceedings.* The facts that are material to the issues on appeal are largely, if not wholly, uncontested. On August 20, 1998, Detective James Robertson, a member of the Gloucester police department drug task force, applied for a warrant to search the defendant's basement apartment at 33 Green Street, Gloucester. In support of the application, the detective submitted a single-spaced, four and one-half page affidavit setting out information he had obtained from two confidential informants, CRI#1 and CRI#2. The affidavit set forth that the detective had been in contact with CRI#1 within the previous two weeks. CRI#1 had, in an earlier investigation, supplied information and conducted a "controlled purchase of controlled substances" that was witnessed by Federal and State authorities. CRI#1 told the detective that presently, and "for a lengthy period of time," CRI#1 had continued an "association" with the defendant and the defendant's girlfriend, Rebecca Seigas,[2] that involved the "dealing [of] drugs illegally." CRI#1 also reported having visited the defendant's apartment on "numerous occasions" in "the recent past" for the purpose of purchasing cocaine and pharmaceutical substances.

Within forty-eight hours of the application, Detective Robertson had also been in contact with CRI#2. CRI#2 had no previous noteworthy dealings with the police, and was "independent

---

[1]The defendant has advanced no argument directed specifically to the motion asserting that the police violated his Miranda rights such that his statements were involuntary, and we therefore treat those propositions as waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

[2]The defendant's girlfriend was referred to as "Rebecca Seigas" in the warrant application, motion hearings, and trial testimony of the police witnesses. In her own testimony, she stated that her name was "Rebecca Liacano." For purposes of clarity, we refer to her as "Seigas."

and unknowing" of CRI#1. CRI#2 reported having conducted drug transactions with the defendant (and having observed others) on "numerous occasions" within the past month. CRI#2 also reported having visited the defendant's apartment within the previous forty-eight hours and, during that time, observed one and one-quarter pounds of marijuana at that location.

The statements of CRI#1 and CRI#2, as reported in Detective Robertson's affidavit, overlapped in a number of respects. Each informant stated that the defendant lived in an apartment on the ground level of 33 Green Street in Gloucester; the defendant's father lived on the upper level; primary access to the defendant's apartment was through the second door "up" on the left side of the house; the defendant occupied the apartment with Seigas; the defendant and Seigas sold marijuana, cocaine, and Percocet (a pharmaceutical class B substance) from the apartment; the defendant stored drugs and drug money at a "safe house" on Webster Street in Gloucester; the defendant was unemployed but was nonetheless spending large sums of cash derived from drug sales on purchases, particularly motor vehicles, (CRI#1 reported that the expenditures involved numerous "toys," including motorcycles and all-terrain vehicles); and the defendant said that he had observed police in the vicinity of his apartment and was concerned about possible surveillance.

Detective Robertson stated also that the police had corroborated information provided by CRI#1 and CRI#2. He set forth in his affidavit that both the defendant and Seigas were known to police, having been arrested in September, 1996, on drug charges following the execution of a search warrant. That case was continued until June 5, 1998, following a finding of sufficient facts by a District Court judge. Additionally, Registry of Motor Vehicles records showed that the defendant lived at 33 Green Street and owned several vehicles that were not subject to liens, including a green 1990 Ford MLX convertible, a gray 1986 Chevy Blazer, and a red Suzuki motorcycle.

Police also corroborated the informants' information concerning the Webster Street address, which they described with varying specificity as the defendant's "safe house." Detective Robertson visited the location with CRI#2, who pointed out the

apartment used by the defendant, and identified a vehicle in the driveway bearing registration number 4125-EV as that of Bryan Nelson. A check of records showed that the car did in fact belong to Nelson. A telephone directory showed that Nelson lived at that address. A review of probation records showed that Nelson had been prosecuted in 1992 for illegal possession of a class D controlled substance, with the charges continued without a finding. In addition, the defendant's vehicle was seen parked outside the Webster Street "safe house" during periodic surveillance.

The application was granted on the day it was filed, and a warrant to search the defendant's apartment issued.[3] Detective Robertson and other officers prepared to execute the warrant that afternoon. But CRI#1 had also reported that the defendant planned to conduct a drug transaction at a barroom that evening, although that information was reflected only obliquely in Detective Robertson's affidavit.[4] CRI#1 predicted that the defendant would leave his home with a quantity of drugs on his person sometime between 5:00 P.M. and 7:00 P.M. Thus, at approximately 4:30 P.M., the police began surveillance of the premises, and as predicted, the defendant, at approximately 5:30 P.M., emerged from his driveway, riding a red motorcycle.

Officer Kenneth Ryan stopped the defendant approximately one-quarter mile away from the apartment. Officer Ryan informed the defendant that the police intended to search his apartment pursuant to a warrant, and then administered the Miranda warnings. The officer also pat frisked the defendant and discovered a large bulge in his pocket. He removed and "temporarily seized" approximately $3,400 in cash. The officers told the defendant that he was not under arrest but asked if he would accompany them to the apartment, telling him that his presence would permit a more focused and efficient search. The defendant agreed and was placed in a police cruiser to be driven

---

[3]A warrant to search the Webster Street "safe house" apparently also issued; it plays no part in this appeal.

[4]The affidavit stated: "This CRI#1 gave these Officers another location in which Mr[.] Ilges deals his drugs on a constant basis on every Friday and Saturday evening."

back to his home. On the way, after receiving Miranda warnings again, the defendant stated that he had Vicodin pills in a safe at the apartment; that he had been selling drugs for good money for years; and that he used the money for expensive purchases, including cars.

On arriving at the apartment, the officers exhibited the search warrant to the defendant and Seigas. They led officers to a safe that the defendant opened to reveal approximately $9,400 in cash and thirty Vicodin pills.[5] Officers also discovered, hidden beneath the headboard of a waterbed, a canister containing plastic bags and 106 grams of cocaine. A scale showing some "residue" and a quantity of a chemical agent used to prepare cocaine for retail sale were also seized.

The defendant was arrested, and the police administered Miranda warnings twice more. The defendant admitted that he had been dealing drugs for years, that the money seized was from drug sales, and that he had been using proceeds from drug sales to make purchases such as a commercial tanning bed, a Jacuzzi, a large television, and several vehicles. The defendant also said that his father and girlfriend desired that he stop selling drugs.

The defendant was indicted and subsequently filed three successive motions to suppress. He moved first to suppress his admissions because police purportedly failed to administer the Miranda warnings. Shortly thereafter, he moved to suppress the items seized in the search of his apartment on the ground that the search warrant was not based on probable cause. Following an evidentiary hearing, the motions were denied. About three months later, the defendant filed his third motion to suppress, this time asserting that the stop when he left his residence on the motorcycle was impermissible, and that consequently all statements and other evidence obtained as a result should be excluded. A different Superior Court judge conducted an evidentiary hearing, and thereafter denied the motion.[6] The defendant was subsequently convicted, and this appeal followed.

---

[5]The pills contained hydrocodone, a class C controlled substance.

[6]The defendant's motions to reconsider were also denied.

2. *The affidavit.* The defendant argues first that the application for the search warrant did not contain sufficient information to establish that the confidential police informants, referenced as CRI#1 and CRI#2, were reliable and possessed adequate bases of knowledge. See *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964) (*Aguilar*); *Spinelli* v. *United States,* 393 U.S. 410, 415 (1969) (*Spinelli*); *Commonwealth* v. *Upton,* 394 Mass. 363, 374-375 (1985) (*Upton II*). In passing upon the question, we give "great deference to the magistrate's determination of probable cause," *Commonwealth* v. *Upton,* 390 Mass. 562, 569 (1983), rev'd, 466 U.S. 727 (1984) (*Upton I*). Our inquiry begins and ends with the "four corners of the affidavit," *Commonwealth* v. *O'Day,* 440 Mass 296, 297 (2003), quoting from *Commonwealth* v. *Villella,* 39 Mass. App. Ct. 426, 428 (1995). In obtaining a search warrant, police may rely upon information provided by a confidential informant only to the extent that the application shows that the informant's statements merit credence. See *Commonwealth* v. *Avery,* 365 Mass. 59, 62-63 (1974). The warrant application must describe "(1) some of the underlying circumstances from which the informant[s] concluded that the contraband was where [they] claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant[s] [were] 'credible' or [their] information 'reliable' (the veracity test)." *Upton II, supra* at 375.

We have little difficulty concluding that the informants in the present case had an adequate basis of knowledge by virtue of their observations of, and participation in, the defendant's drug dealings. Indeed, the defendant concedes that the affidavit reflects an adequate basis of knowledge on the part of CRI#2. As to CRI#1, that informant reported having a current and ongoing "association" with the defendant in the "dealing [of] drugs illegally," and having been inside the defendant's apartment on "numerous occasions" to purchase drugs.

The defendant argues that the affidavit did not state how recently CRI#1 had actually conducted a drug transaction with the defendant. The transactions themselves were said only to have occurred in the "recent past." We recognize that "[b]ecause narcotics are 'readily consumed or distributed,' in

some circumstances 'probable cause to search for them rapidly dwindles' with the passage of time." *Commonwealth* v. *Matias*, 440 Mass. 787, 792 (2004), quoting from *Commonwealth* v. *Matias*, 58 Mass. App. Ct. 231, 236 (2003). Nevertheless, this informant also reported a current and ongoing illegal association with the defendant. This relationship, combined with the "interlocking" statement of CRI#2, satisfied the basis of knowledge requirement. See *Commonwealth* v. *Peterson*, 61 Mass. App. Ct. 632, 635 (2004) (informants' "relationship with the defendant permits the inference that their knowledge was based upon their interactions with and personal observations of the defendant"). Actual drug transactions are not required to satisfy the basis of knowledge element. See *Commonwealth* v. *Lapine*, 410 Mass. 38, 41 (1991) (basis of knowledge established by informant's overhearing of conversation between defendant and two other men). In addition, "time is of less significance" here, because the defendant was alleged to have engaged in "protracted or continuous conduct." *Commonwealth* v. *Cruz*, 430 Mass. 838, 843 (2000), quoting from *Commonwealth* v. *Vynorius*, 369 Mass. 17, 25 (1975).

We thus turn to the "veracity" element. Here, the Commonwealth concedes that CRI#1's previous participation in an unrelated "controlled buy," perfunctorily described in the affidavit, by itself added nothing to the determination of that informant's reliability. See *Commonwealth* v. *Mejia*, 411 Mass. 108, 111-114 (1991). The Commonwealth also does not claim that the affidavit set out sufficient information to support a finding that the statement of either informant was against penal interest and therefore worthy of belief. See *Commonwealth* v. *Melendez*, 407 Mass. 53, 56 (1990). Instead, the Commonwealth contends that the interlocking nature of the informants' statements, buttressed by police corroboration, satisfied the "veracity" requirement.

The Supreme Judicial Court has agreed that interlocking statements, sufficiently detailed, may satisfy the veracity test even though the statement by either informant does not by itself convince of its reliability. "[U]nnamed informants' detailed statements corroborating each other in significant, detailed respects . . . could alone support a finding of probable cause

by establishing the veracity of the informants." *Commonwealth*
v. *Nowells*, 390 Mass. 621, 627 (1983). See *Commonwealth* v.
*Parapar*, 404 Mass. 319, 323-324 (1989) (applying the
standard); *Commonwealth* v. *Desper*, 419 Mass. 163, 167 (1994)
(same). In *Nowells*, the court cited with approval the reasoning
of the United States Court of Appeals in *Williams* v. *Maggio*,
679 F.2d 381, 391 (5th Cir. 1982), cert. denied, 463 U.S. 1214
(1983), wherein it was held that an affidavit that lacked any
suggestion of informant veracity apart from the interlocking
nature of two informant statements nonetheless satisfied the
veracity requirement. *Id.* at 391-392. The Supreme Judicial
Court subsequently reaffirmed its avoidance of hypertechnical
interpretations in this regard for purposes of art. 14 of the
Declaration of Rights. See *Upton II*, 394 Mass. at 374.

The concept is easier to state than to apply. It appears to be
based on the idea that distinctive, generally unknown facts
reported by two individuals not acting in concert are likely to
be true. In other words, it is reasonable to assume that, if such
informants are lying or mistaken, it is improbable that they will
give consistent reports of the facts in question. "If the smoke is
heavy enough, the deduction of a fire becomes reasonable."
*People* v. *Sheridan*, 2 Cal. App. 3d 483, 489 (1969), quoting
from *People* v. *Gamboa*, 235 Cal. App. 2d 444, 447 (1965). The
difficulty arises when faced with the task of deciding when the
details provided simultaneously by the respective informants are
sufficiently distinctive, and there is a sufficient degree of agree-
ment, that a magistrate may rely on those details in making the
probable cause determination.

We are guided to some extent by prior decisions on the
subject by the Supreme Judicial Court and by this court. The
level of interlocking detail provided by the informants in the
present case is greater than in certain cases where the level of
detail was held to be insufficient. See *Commonwealth* v. *No-
wells*, 390 Mass. at 627; *Commonwealth* v. *Rojas*, 403 Mass.
483, 488 (1988); *Commonwealth* v. *Allen*, 406 Mass. 575, 580
(1990); *Commonwealth* v. *Santana*, 411 Mass. 661, 665 (1992);
*Commonwealth* v. *Desper*, 419 Mass. at 167. We have held on a
number of occasions that informant statements interlocked suf-
ficiently to satisfy the veracity element. See *Commonwealth* v.

*Ciaramitaro*, 26 Mass. App. Ct. 110, 115 (1988); *Commonwealth* v. *Farinon*, 29 Mass. App. Ct. 945, 945-947 (1990); *Commonwealth* v. *Luce*, 34 Mass. App. Ct. 105, 110 (1993); *Commonwealth* v. *Watson*, 36 Mass. App. Ct. 252, 256 (1994); *Commonwealth* v. *Russell*, 46 Mass. App. Ct. 513, 518-520 (1999); *Commonwealth* v. *Rice*, 47 Mass. App. Ct. 586, 588-589 (1999). But each case is different in the nature and degree of interlocking detail, and in some respects the analysis reduces to the standard of "I know it when I see it." *Jacobellis* v. *Ohio*, 378 U.S. 184, 197 (1964) (obscenity case).

In applying the somewhat elusive standard to the present facts, we are mindful of the "great deference" owed to the reviewing magistrate, *Upton I*, 390 Mass. at 569, and the admonition that "[t]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985), quoting from *United States* v. *Ventresca*, 380 U.S. 102, 108-109 (1965). We agree with the motion judge that the informants' statements corroborated one another in "significant, detailed respects." *Commonwealth* v. *Nowells*, 390 Mass. at 627. The statements overlapped on unusual facts, such as the types of contraband that the defendant was reported to be selling (cocaine, marijuana, and Percocet). The reports reflected matching detail regarding the arrangement of the defendant's home (a basement apartment with primary access through a particular side-door), the defendant's social and familial relations (he lived with Seigas and his father lived upstairs), his employment status (unemployed), the inner workings of his illicit business (using a particular location to store cash and drugs), the preferred destination for cash proceeds from his illicit business (motor vehicle purchases), and his concern with ongoing police surveillance. We think it improbable that two individuals could separately concoct false accounts of the defendant's activities that would interlock in such significant detail.

In addition, police corroborated the defendant's address, his ownership of motor vehicles that were not subject to loans, and his periodic presence at a Gloucester location described by the

informants as a "safe house." That the defendant and Siegas had been the targets of an earlier cocaine possession prosecution in which sufficient facts had been found further corroborated the accusations that they were again involved in the distribution of narcotics.[7] See *Commonwealth* v. *Allen*, 406 Mass. 575, 579 (1990). Moreover, the cooperation of one of the informants in the past, while insufficient by itself to establish veracity, is a factor that can be considered. Thus, we conclude that, "taking a common sense view of the affidavit as a whole," *Commonwealth* v. *Russell*, 46 Mass. App. Ct. at 519, there was a substantial basis for determining that the statements of the confidential informants were trustworthy and that contraband would be found in a search of the defendant's apartment. See *Commonwealth* v. *Donahue*, 430 Mass. 710, 712-715 (2000).

The defendant makes a passing argument that the warrant application did not establish probable cause under principles enunciated in *Illinois* v. *Gates*, 462 U.S. 213, 233, 238 (1983). In that case, the United States Supreme Court essentially abandoned the two-prong analysis of *Aguilar* and *Spinelli* (basis of knowledge and veracity) in favor of a "practical, common-sense [inquiry into] whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. The Court suggested that "veracity" and "basis of knowledge" were "better understood as relevant considerations in the totality-of-the-circumstances analysis" and that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Under *Gates*, there is only one relevant inquiry, that of over-all reliability.

The Supreme Judicial Court declined to follow *Gates*, concluding that art. 14 of the Massachusetts Declaration of Rights required more than what was sufficient to satisfy the Supreme Court for purposes of the Fourth Amendment to the

---

[7] We do not rely on the drug prosecution of Bryan Nelson, the occupant of the Webster Street "safe house," because of our concern that the prosecution, which concluded more than four years prior to the warrant application, may be considered "stale" for our purposes.

United States Constitution. See *Upton II*, 394 Mass. at 376.[8] Massachusetts continues to apply prior Federal law that the Federal courts themselves no longer follow. Thus, under art. 14, it has remained that "each element of the [*Aguilar-Spinelli*] test must be separately considered and satisfied or supplemented in some way." *Ibid.* The *Gates* decision generally makes life easier for the prosecution, and consequently provides no relief for the defendant. "We review the contested search in light of the more stringent standards of art. 14, with the understanding that, if these standards are met, so too are those of the Fourth Amendment." *Commonwealth* v. *Byfield*, 413 Mass. 426, 429 n.5 (1992).

Finally, the defendant parses the affidavit in an effort to locate ambiguities or ellipses that call the substance of the information into question. We are not persuaded by the enumerated objections. The point of the affidavit is to convince the magistrate that probable cause to conduct a search exists. As Justice Kass pointedly stated: "[Strict] adherence to the requirements of *Aguilar-Spinelli* is intended to protect the public from searches based on unreliable informers and unreliable information, not from sub-par expository writing by law enforcement officers." *Commonwealth* v. *Russell*, 46 Mass. App. Ct. at 520. We are satisfied that this affidavit provided an adequate basis for a finding of probable cause to search the defendant's apartment.

3. *The stop.* It is also argued that the stop of the defendant when leaving his residence on a motorcycle was unlawful because not supported by probable cause. Therefore, the defendant contends, the money taken from him and his subsequent statements should not have been admitted in evidence. See *Wong Sun* v. *United States*, 371 U.S. 471, 484-485 (1963). The motion judge determined that the stop was

---

[8]A sizeable majority follow *Gates* for State law purposes. See, e.g., *People* v. *Tisler*, 103 Ill. 2d 226, 241 (1984); *People* v. *Levine*, 461 Mich. 172, 180 (1999); *State* v. *Lewis*, 116 N.J. 477, 486 (1989). A minority reject *Gates*. See, e.g., *People* v. *Griminger*, 71 N.Y.2d 635, 639 (1988). Other states have adopted the *Gates* approach by constitutional enactment, see *Bernie* v. *State*, 524 So. 2d 988, 990-991 (Fla. 1988), whereas others require adherence to *Aguilar-Spinelli* by statute or rule, see *State* v. *Binner*, 128 Or. App. 639, 647 n.2 (1994).

lawful under the principles of *Terry* v. *Ohio*, 392 U.S. 1, 30 (1968), but that the patfrisk that disclosed $3,400 in cash was not justified. She ruled, however, that the cash need not be excluded as evidence because it would inevitably have been discovered and seized by lawful means, a proposition that the defendant obviously disputes.

We agree with the motion judge that the stop was permissible. The police, having already established to a magistrate's satisfaction that there was probable cause to believe that evidence of unlawful drug activities would be found in the defendant's apartment, and armed with additional information that the defendant would leave his apartment at about that time to conduct his drug business, had, at the very least, a reasonable suspicion that the defendant was then engaged in criminal activity. See *Commonwealth* v. *Willis*, 415 Mass. 814, 818-819 (1993). We agree as well that the patfrisk was improper. Nothing in the record suggests that the officers had reason to fear for their safety or the safety of the public as a result of the encounter. See *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974); *Commonwealth* v. *Davis*, 41 Mass. App. Ct. 793, 795 (1996).

Where we part company with the motion judge is her conclusion that "inevitable discovery" of the cash improperly seized from the defendant rendered the cash admissible in evidence despite the fact that it was the product of an unlawful search. The inevitable discovery exception to the exclusionary rule turns on (1) the inevitability of discovery of the evidence, and (2) the character of the police wrongdoing. See *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989). We are unable to get past the first consideration.

For the principle of inevitable discovery to apply, subsequent discovery of the evidence in question must be "certain as a practical matter." *Commonwealth* v. *Perrot*, 407 Mass. 539, 547 (1990), quoting from *Commonwealth* v. *O'Connor*, *supra*. The certainty of discovery must exist at the time of the unlawful seizure, *Commonwealth* v. *O'Connor*, *supra* at 117 n.4, not develop as a result of circumstances occurring thereafter. Here, the evidence did not warrant a finding of inevitable discovery. The patfrisk and seizure of the cash took place prior to the

obtaining of the defendant's consent to return with the police to his apartment (where, we agree, he would have been arrested following execution of the search warrant, and a search incident to that arrest would have disclosed the money). Had the defendant not agreed to accompany the police (a possible alternative given that he was not under arrest at that time), it is not at all clear that the *Terry* stop would have concluded with the defendant in custody. The police could not have compelled him to return to the apartment merely because they had a warrant to search those premises. See *Commonwealth* v. *Charros*, 443 Mass. 752, 762-764 (2005). If this were in fact only a *Terry* stop, it could well have ended with the defendant having a right to leave, thereby rendering subsequent lawful seizure of the cash anything but inevitable.

We believe that the evidence that the defendant had $3,400 in cash on his person at the time was admissible on alternative grounds. "An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings." *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997). We are satisfied that, at the time of the stop, the police had probable cause to arrest the defendant.[9] That they did not do so at the time of the patfrisk is of no moment if probable cause to arrest then existed. See *Commonwealth* v. *Johnson*, 413 Mass. 598, 602 (1992).

"Probable cause to arrest exists where the facts and circumstances in the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed." *Commonwealth* v. *Williams*, 422 Mass. 111, 119 n.11 (1996). We have spelled out above the "reasonably trustworthy information" in the possession of the police. "[A] requirement of sufficient evidence to establish . . . probable cause to arrest [a suspect] is considerably less exacting than a requirement of sufficient evidence to warrant a guilty finding." *Commonwealth* v. *O'Dell*, 392 Mass.

---

[9]The motion judge recognized that this was a possibility, stating that "[t]he police officers, *at the very least*, had reasonable suspicion to stop [the defendant] on his motorcycle" (emphasis supplied).

445, 451 (1984). The police here had an adequate basis on which to arrest. If there was a right to arrest, there was a right to search. See G. L. c. 276, § 1; *Commonwealth* v. *Johnson,* 413 Mass. at 602.[10]

*Judgments affirmed.*

---

[10]In light of our conclusion, we do not address the Commonwealth's contention that, even assuming that admission of this evidence was error, the error was harmless beyond a reasonable doubt, see *Commonwealth* v. *Molina,* 439 Mass. 206, 211-212 (2003), in light of other evidence seized pursuant to the search warrant and the defendant's own admissions.