Fabricant, Judith, J.
INTRODUCTION
The defendants are charged with trafficking in cocaine, based on evidence seized upon execution of a search warrant for the house they occupy together. Before the Court are the defendants’ motions to suppress the evidence seized. For the reasons that will be explained, the motions will be denied.
BACKGROUND
The search warrant, issued by the Wrentham District Court on October 8, 2004, authorized police to search for cocaine, marijuana, related paraphernalia and records, and evidence of sales of such materials, at 4 Highland Lake Drive in Walpole, and “on the person or in the possession” of Petros and Piacentini, identified by name, as well as any person present “who may be found to have such properly in his or her possession or under his or her control or to whom such property may have been delivered.”
The affidavit in support of the warrant was submitted by Walpole Police Officer William Bausch. The affidavit, dated October 18, 2004, reported information from five confidential informants, each identified by a pseudonym but whose identify police knew, along with additional information derived from police investigation, as follows. “Jeny,” the affidavit recites, had given the officer “information in the past that has lead to two arrests and the seizure of cocaine,” resulting in court cases “presently pending.” Jerry provided his information in a conversation “[djuring the summer of 2004.” Jerry reported that “there are” two men in Walpole selling cocaine, living together on Highland Lake Avenue, known to Jerry as Paul and Alee, and *665 that he would not go to their house, but rather that “his friend would make a phone call and they would go to a location in Walpole where they would meet either Paul or Alee” and would then purchase crack or cocaine. Jerry identified the friend, a person known to Officer Bausch, and described Paul as “handicapped with his legs.” Jerry reported that his friend was the source of the information that the men lived on Highland Lake Avenue.
“George” also provided information “(d]uring the Summer of 2004.” George had in the past given Bausch information “that has lead to the arrest of a person that sold cocaine to me while working undercover,” giving rise to a pending case. George reported that he “was able to go with a friend to Walpole and purchase cocaine from a man named Paul,” and that “his friend would make a phone call and they would drive to a location where they would meet Paul.” George did not know where Paul lived, but did report that Paul was handicapped. George identified his friend, who was a person known to Bausch, not the same person as Jerry’s friend. Sometime later, George provided a last name for Paul — "Petrose"—and also indicated that Paul lived with a man named “Pecatenie.” George attributed that information to a person he named, who was not known to Bausch.
“Elaine” provided information to Wrentham Detective O’Connell, who passed that information on to Bausch during the summer of 2004. Elaine had previously given Bausch and O’Connell the location of a person for whom an arrest warrant was outstanding for selling cocaine. Elaine reported that “she went to a house in Walpole and purchased cocaine from a man named Paul.” She gave the address as 4 Highland Lake Avenue, and also gave the registration number for Paul’s car as 5220VD. That registration number, according to Bausch’s affidavit, corresponds to a vehicle owned by Paul Petros, with an address in Westwood, and a Board of Probation record showing 51 arraignments, nine of which involve controlled substance violations.
Through investigation of Town of Walpole records, Bausch learned that Alan Piacentini lived at 4 Highland Lake Drive in Walpole, and that his Board of Probation record reflected twenty arraignments, two for controlled substance violations. Bausch obtained photographs of Petros and Piacentini, and showed them to Jerry, who identified Petros as the person he had referred to as Paul, and Piacentini as the person he had referred to as Alee.
In September 2004, Bausch spoke with another confidential informant, “Kramer.” Kramer had previously provided information that “leads to the arrest of four cocaine dealers” whose cases were pending. Kramer reported having purchased cocaine from a man named Paul who lived on Highland Lake Drive, who “is handicapped and has trouble getting around,” and who “lives with a guy named Alee,” from whom Kramer had made purchases. Kramer reported that “if Paul does not want him to come to the house he sends Alee to meet him somewhere.” Kramer also reported that he “has seen cocaine and marijuana inside the house on Highland Lake Drive. Shown photographs of Petros and Piacentini, Kramer identified them as the individuals he referred to as Paul and Alee.
Bausch and O’Connell conducted surveillance of the house at 4 Highland Lake Drive in August, September and October 2004. The street is short, with little foot or vehicle traffic. During surveillance, the officers saw nineteen different vehicles go to the house. “Many times,” according to the affidavit, a person would “go into the house and then come back out and leave after only a few minutes.” The officers checked Board of Probation records on the registered owners of two vehicles that visited the house several times in this period; both included entries for controlled substance charges, resolved by means of continuance without a finding.
In August 2004, Bausch spoke with another informant, “Newman.” Newman had previously given Bausch information leading to three arrests for cocaine distribution, one of which resulted in an admission to sufficient facts; the other two remained pending. Newman related that he would given money to a named friend — the same friend named by George — and that the friend would purchase cocaine for him, indicating that it came from a man named Paul at a house in Walpole.
On August 26, 2004, Bausch went through the trash left outside 4 Highland Lade Drive. He found marijuana stems, a marijuana seed, a burnt marijuana roach, and two used hypodermic needles. He also found fifteen baggie knots and sixteen torn open baggies, a small straw tube fashioned from a Bic pen, a broken burnt test tube, two lighters, razor blades, and eighteen pieces of burnt tin foil. The affidavit set forth information regarding the significance of these items in drug distribution and usage, based on Bausch’s training and experience: a straw tube may be used to snort cocaine; tin foil may be used to make a pipe for smoking crack, which is made by cooking cocaine; baggies are used to package cocaine for sale, with the bag tied off by a knot.
On September 10, 2004, Bausch again went through the trash left outside the house. He found a baggie with marijuana residue, marijuana stems, a marijuana roach, and a “blunt rapper,” which he indicated is used to smoke marijuana mixed with cigar tobacco. He also found twenty baggie knots, seventeen torn baggies, six pieces of burnt tin foil, two pieces of broken burnt test tube, a box of baking soda, and three hypodermic needles. Baking soda, he reported, can be mixed with cocaine to make crack. Also found in the trash were papers bearing Petros’s name, among them prescription vials and mail from medical providers, and other papers bearing Piacentini’s name, as well as *666 mail with the names of three persons whom the police had connected to the house.
Detective O’Connell went through trash outside the house on October 15, 2004. He found a marijuana stem, eighteen baggie knots, thirteen torn baggies, and two hypodermic needles, as well as papers bearing the names of both defendants and others.
The warrant issued, based on Bausch’s affidavit, on October 18, 2004. The officers executed the warrant, according to the return signed by Bausch, on October 21, 2004 at 5:20 p.m.[1] Petros was present during the search, and was arrested and searched at that time. Piacentini was not present, but drove his car into the driveway at the house at approximately 8:15 p.m., and entered the house. Police had waited; upon his arrival, they arrested him and searched both his person and the car in which he had arrived. They found cash on his person, and two glass tubes containing cocaine residue and a box of baking soda in the car.[2]
DISCUSSION
The defendants now seek to suppress all of the evidence seized, on three grounds. They argue that the information set forth in the affidavit was insufficient to establish probable cause; that the information was stale; that the police exceeded the scope of the warrant by waiting for Piacentini; and that the search of the car was not authorized by the warrant or by any other source. The Court will address these issues in turn.
To establish probable cause, “an affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.” Commonwealth v. Cruz, 430 Mass. 838, 840 (2000) (quoting Commonwealth v. Cinelli, 389 Mass. 197, 213 (1983)). In making this determination, the Court considers only the affidavit upon which the magistrate made the finding and reads it “as a whole, not parsed, severed, and subjected to hypertechnical analysis.” Commonwealth v. O’Day, 440 Mass. 296, 297, 301 (2003).
When a supporting affidavit relies on information from a confidential informant, Article 14 requires that an affidavit present:
(1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was “credible” or his information “reliable” (the veracity test).
Commonwealth v. Upton, 394 Mass. 363, 375 (1985) (quoting Aguilar v. Texas, 378 U.S. 108, 114 (1964); Spinelli v. United States, 393 U.S. 410, 415 (1969)). Each element of this test “must be satisfied or supplemented in some way.” Id. at 376. Independent police corroboration may remedy a deficiency in either or both. See Commonwealth v. Wilson, 441 Mass. 390, 395 (2004). As to the veracity prong, many considerations are relevant. “The test may be satisfied by demonstrating that the informant has provided information in the past which has proved to be accurate.” Commonwealth v. Perez-Baez, 410 Mass. 43, 45 (1991). In this regard, information that has led to seizures of drugs suffices, although “[a] naked assertion that in the past the informant had provided information which led to a prior arrest is insufficient by itself to establish an informant’s veracity.” Id. at 45-46, quoting and distinguishing Commonwealth v. Rojas, 403 Mass. 483, 486 (1991). Information providing the location of a fugitive also suffices. See Commonwealth v. Valdez, 402 Mass. 65, 70-71 (1988). Similarly, police confirmation of a controlled buy conducted by the informant establishes reliability. See Commonwealth v. Warren, 418 Mass. 86, 89 (1994).
In addition to past information, officers’ knowledge of the informant’s identity and whereabouts, although not enough in itself, “is a factor that weighs in favor of reliability.” Commonwealth v. Alfonso, 438 Mass. 372, 376 n.4 (2003). The amount of detail provided by the informant also tends to support reliability. See id. at 375. Finally, the statements of multiple informants, if “interlocking and sufficiently detailed, may satisfy the veracity test even though the statement by either informant does not by itself convince of its reliability.” Commonwealth v. Ilges, 64 Mass.App.Ct. 503, 509 (2005). “If the smoke is heavy enough, the deduction of a fire becomes reasonable.” Id. at 510 (quoting California v. Gamboa, 235 Cal.App.2d 444, 447 (1965)).
As to the basis of knowledge test, it is well settled that an informant’s personal observations are sufficient to satisfy this prong. See Commonwealth v. Spano, 414 Mass. 178, 185 (1993); Commonwealth v. Carrasco, 405 Mass. 316, 321 (1989). However, casual rumors or hearsay are inadequate. See Commonwealth v. Reddington, 395 Mass. 315, 324 (1985).
Here, to evaluate the sufficiency of the information in the affidavit, the Court must consider both the information from informants, and the information obtained by police independently. Of the five informants, the affidavit provides information as to four of them, Jerry, George, Elaine, and Newman, indicating that each had proved reliable in the past: Jerry had provided information leading to a seizure of cocaine; George had provided information leading to an undercover purchase by the affiant officer; Elaine had provided the location of a fugitive; and Newman had provided information leading to an admission to sufficient facts.[3] The affidavit does not provide equivalent information regarding Kramer, reciting only that he had provided information in the past leading to arrests. The information he provided, however, matches *667 that provided by the others, such that he and the other informants tend to corroborate each other.
Of the four informants with a history of reliability, each had personal knowledge of certain parts of the information supplied. Jerry had personally made purchases from Paul and Alee, whom he identified by photographs as the defendants, in Walpole, and had observed that Paul had some kind of disability affecting his legs. George, similarly, had personally made purchases from a man named Paul in Walpole, and had also observed the disability. Elaine added considerably more; she had actually gone to the house to purchase from Paul there, and was able to give the address of the house, as well as Paul’s last name and the registration of his vehicle, which Registry records connected to the defendant Paul Petros. Newman had little to add of his personal knowledge, but provided some corroboration through the consistency of his information with that provided by the others. Kramer, although lacking a history of demonstrated reliability, reported having purchased cocaine from both Paul and Alee, whom he identified by photographs as the defendants, and having seen cocaine and marijuana inside the house. While his information standing alone would not meet the Aguilar-Spinelli test, his report corroborates those of the others, as theirs do his.
To the informants’ information must be added that compiled by the police from independent sources. Through public records, they were able to establish that Alan Piacentini, whom Jerry and Kramer had identified from a photograph as “Alee,” lived at 4 Highland Lake Drive. Although no public records indicated that Paul Petros' lived there, Jerry’s and Kramer’s information connected Petros to Piacentini, and Elaine’s information connected Petros to the house at that address. The police thus had a basis to believe that both Piacentini and Petros were conducting a drug distribution operation from that address.
Additional information derived from surveillance and examination of trash. Surveillance over a three-month period revealed nineteen separate vehicles visiting, many for very short periods, some registered to individuals with records of drug activity. Defendants point out that this is not a large number for a three-month period, and suggest various innocent explanations: the visitors may have been providing health care services or delivering medications, or may have gone to the door and found no one at home. The latter suggestion is inconsistent with the statement in the affidavit that the visitors went “into” the house. The former, while possible even if not probable, given the shortness of the visits, does not undermine the value of the officers’ observations in supporting probable cause. The observations do not stand alone; they corroborate the informants’ reports of on-going drug distribution activity. See Commonwealth v. Hall, 366 Mass. 413, 418 & n.17 (observations by police of suspected drug dealers and users briefly visiting premises supported credibility of informant’s statements) .
The examinations of trash add more support. The officers found multiple items consistent with use, production, and distribution of marijuana, crack, and cocaine. The defendants point out that some of the items found have innocent uses, or might be explained by medical treatment. Again, while that may be so, it does not undermine the significance of the items for probable cause, considered as part of the overall set of information provided in the affidavit. The defendants also suggest that the findings indicated only use, not distribution. That might fairly be said of many of the items found, but not of the multiple plastic bag knots and torn bags, which Bausch identified, from his training and experience, as indicative of packaging cocaine for sale. Moreover, even evidence of personal use on an on-going basis would support an inference that drugs would be present, justifying issuance of a search warrant. The information set forth in the affidavit, considered as a whole, provided probable cause to believe that drugs would be found in the house at 4 Highland Lake Drive.
The facts submitted in support of a search warrant application must be “closely related to the time of the issue of the warrant [so] as to justify a finding of probable cause at that time.” Commonwealth v. Matias, 440 Mass. 787, 792 (2004) (quoting Sgro v. United States, 287 U.S. 206, 210 (1932)). When the object of a search is narcotics, probable cause dwindles rapidly with the passage of time, because narcotics may be readily consumed or distributed. See id. Nonetheless, older information may remain relevant if the “affidavit recites activity indicating protracted or continuous conduct.” Id. In effect, the more recent information updates the older information. See Commonwealth v. Rice, 47 Mass.App.Ct. 586, 589 (1999). In assessing protracted criminal conduct, the most important factor “is the number and quality of observations . . .” Id. at 590 (quoting Commonwealth v. Reddington, 395 Mass. 315, 324 (1985)).
Rice is instructive. There the officer’s affidavit recited mutually corroborating tips from three separate informants received over a period of some fifteen months, without specificity as to when the informants had made their observations, followed by a controlled buy made “within the past month” prior to the application for the warrant. 47 Mass.App.Ct. at 586-87. Those facts, the Court concluded, sufficed to provide probable cause to believe a that a continuous enterprise existed, so as to overcome the staleness of some of the information. Id. at 591.
Here, as in Rice, the affidavit does not specify the timing of the informants’ observations, but describes them in such a manner as to support an inference of “substantial contemporaneity.” Id. at 589. All five informants gave their reports during the summer or early fall of 2004, within at most four months of the *668 date of the affidavit. The officers conducted their surveillance within a three-month period before the affidavit. Indeed, the most recent police observation occurred on October 15, 2004, only three days before the warrant application, and six days before the search. The information gathered by the officers, including the informants’ reports as well as the independent police corroboration, was “of sufficient number and quality,” as to show a continuous criminal activity. Id. at 590. The information provided in the affidavit was therefore not so stale as to invalidate the warrant.
The defendant’s final argument is that the police exceeded the scope of the warrant by waiting three hours for Piacentini’s arrival and then searching his car. The Supreme Judicial Court has held that “the scope of a warrant authorizing the search of a particularly described residence includes any automobiles, owned or controlled by the owner of such residence, which are located within the curtilage of the premises at the time the warrant is executed.” Commonwealth v. Signore, 404 Mass. 400, 403 (1989). Later case law has applied that rule to rental housing, and has elucidated the extent of the curtilage in a manner that would certainly include the driveway of a single-family house. See Commonwealth v. McCarthy, 428 Mass. 871, 873-74 (1999). Here, Piacentini resided in the house, and parked his car in the driveway.
The warrant thus would have included his car, without the need for any express reference to it, if it had been at the house when police executed the warrant.
The car was not, however, at the house when the police executed the warrant at 5:20 p.m.; it arrived with Piacentini some three hours later. The question, then, is whether police were authorized to remain at the house to await his arrival, and then to resume the search with the car. On this particular point, neither side has identified any directly pertinent case law, nor has the Court found any. The Court must therefore apply the basic principle of reasonableness, on which the fourth amendment and article twelve are based. The warrant reflects a judicial determination of probable cause with respect to both Petros and Piacentini, their home, and any properly in their possession. On that basis, the warrant authorized a broad intrusion on their privacy. As far as the record discloses, it was a matter of fortuity that Piacentini was out when police arrived: nothing before the Court suggests that he was aware of the search or in any way relied on a perception that it had ended. It is difficult to perceive any additional intrusion arising from the three-hour wait. That is not to suggest that police could keep a home under occupation for an unlimited period after completing a search, but the Court cannot conclude that the three hours involved here was unreasonable.
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motions to Suppress are DENIED.

 Defense counsel assert that the usual police practice is to note on the return the time the search is completed. The Commonwealth does not dispute that the time entered reflects completion of the search of the house.

 This motion was heard on the papers, without the taking of evidence. The Commonwealth has stipulated to the facts regarding execution of the warrant and the search of Piacentini and his car as set forth in the defendants’ memoranda.

 Defendant Piacentini points out that admission to sufficient facts is not a conviction. That is true, and for that reason such a disposition is not admissible in evidence to impeach a witness. The question here, however, is not admissibility in evidence, but reliability of the informant. That the informant had provided information leading to such a disposition is enough to support his reliability.