COMMONWEALTH *vs.* MARIO BARROS.

No. 01-P-861.

Bristol. September 19, 2002. - December 6, 2002.

Present: DOERFER, COHEN, & GREEN, JJ.

*Homicide. Constitutional Law,* Result of illegal interrogation, Admissions and confessions, Assistance of counsel. *Evidence,* Result of illegal interrogation, Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Capital case, Admissions and confessions, Voluntariness of statement, Warrant, Assistance of counsel. *Search and Seizure,* Warrant, Inevitable discovery, Clothing.

A Superior Court judge properly granted a criminal defendant's motion to suppress statements he made at his home during a custodial interrogation that police officers conducted without giving him Miranda warnings, as well as sneakers and clothing belonging to the defendant that the police seized at his home, where the defendant's consent to lead the officers into his bedroom where the sneakers and clothing were found was directly caused by the illegal custodial interrogation [678-679], and where it could not be said that the police would inevitably have discovered the sneakers and clothing, in that the Commonwealth failed to prove that the police would have executed a default warrant against the defendant on an unrelated charge without having gained valuable information as a result of the unlawful questioning [679-681].

A Superior Court judge properly granted a criminal defendant's motion to suppress statements he made at a police station after invoking his right to counsel, where the defendant's choice of words in invoking his right to counsel was not, when taken in the context in which they were spoken, a mere reference to an attorney that was ambiguous and equivocal, such that a reasonable officer in those circumstances would have understood only that the defendant *might* be invoking his right to counsel. [681]

INDICTMENTS found and returned in the Superior Court Department on September 28, 2000.

A pretrial motion to suppress evidence was heard by *David A. McLaughlin,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina,* J., in the Supreme Judicial

Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Steven E. Gagne,* Assistant District Attorney, for the Commonwealth.

*Dana Alan Curhan (Lori A. Benavides* with him) for the defendant.

DOERFER, J. The defendant is charged with murder in the first degree. A judge of the Superior Court allowed the defendant's motion to suppress certain of his statements, as well as certain physical evidence seized from his bedroom. A single justice of the Supreme Judicial Court allowed the Commonwealth's application under Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996), for leave to take this interlocutory appeal. We affirm.

*Facts.* The judge held an evidentiary hearing and found, in a detailed and clear memorandum of decision, substantially the following facts:

Near midnight on the evening of August 21, 2000, there was a homicide on Purchase Street in New Bedford. A man had been kicked and beaten to death. The police saw evidence of the remains of paint balls, blood, and empty beer bottles at the scene. Detective Dean Fredericks of the New Bedford police department observed the victim's body at the hospital and saw trauma to his head and blood over his face. An eyewitness told the police that two young men had beaten the victim and fled the scene. One of them had yelled "Mario" to the other as they fled.

At about 6:00 A.M., Detective Fredericks met with State Trooper Ronald Blais and New Bedford police Detective Charles Perry. Detective Perry mentioned that he knew a young man named Mario Barros who lived in the neighborhood where the homicide had occurred. They checked and found an outstanding default warrant for the defendant. They decided to use the warrant to gain entry to the defendant's home and to interview him about the incident. The underlying charge on which the defendant had defaulted was for disturbing the peace. The police did not intend to take the defendant into custody on the warrant unless their interview with him on the murder investigation proved fruitful.

Police knocked on the door of the defendant's home a short time later, announced they had a warrant for his arrest, and were admitted without incident. The defendant was dressed only in a T-shirt and boxer shorts, and was barefoot; it appeared as though he had been sleeping. He was seventeen years old. The three officers had an imposing and professional appearance and manner.[1] They immediately began to question the defendant in a small room in the defendant's home.

Without giving the defendant Miranda warnings, the police proceeded to ask him questions about the incident on Purchase Street. He told them that he and friends had been drinking and shooting paint balls. When asked if he owned a paint ball gun, he told them that he had sold his paint ball gun but still had the box. He asked the officers if they wanted to see the box, and they said they did. The defendant then led the officers to his bedroom for the purpose of retrieving the box. When the officers followed the defendant into his bedroom, they observed in plain view in the middle of the floor sneakers that appeared to have dried blood on them. The defendant, upon request, produced the clothing he had worn the previous night. The officers placed the defendant under arrest, allowed him to get dressed, handcuffed him and took him to the police station.

At the police station the defendant was handcuffed by one wrist to the wall in the detectives room. He was given Miranda warnings at about 7:50 A.M. He stated that he understood his rights and signed a waiver, consenting to questioning. He made a phone call to his uncle stating that he would be unable to report for work. He was then interviewed for about twenty minutes. Toward the end of the interview, one of the detectives said that he did not think the defendant was telling the truth. The defendant then said he did not think he wanted to continue to talk to the detectives without an attorney. The detectives told him to think about it, and left the room.

The detectives then learned that a witness had identified the defendant from a photograph as one of the assailants. They returned to the room and informed the defendant that he was being charged with murder. The defendant thereupon became

---

[1]This was the conclusion of the motion judge who observed them at the hearing.

visibly upset, began breathing heavily with tears in his eyes, and asked rhetorically, "He died?" He said he might faint. His handcuffs were removed. The detectives asked him if he wanted to talk to them. He said yes, and agreed to memorialize the interview on videotape. He was given Miranda warnings again and executed a second waiver form. He then gave an inculpatory statement.

*Analysis.* The defendant claimed before the motion judge that he was subject to a custodial interrogation at his home without receiving Miranda warnings, and that he was further interrogated at the police station after he had invoked his rights to end the questioning and to meet with a lawyer. The motion judge allowed the defendant's motion to suppress the statements obtained during the interview at the defendant's home as well as those made during the final interview at the New Bedford police station (i.e., after the defendant had invoked his rights under *Miranda* v. *Arizona*, 384 U.S. 436 [1966]). The judge also granted the motion to suppress the defendant's sneakers and clothing seized at his home. He denied the defendant's motion to suppress the evidence and statements obtained from the defendant from the first interview at the New Bedford police headquarters. His rulings are discussed in the context of the points raised by the Commonwealth in this appeal, which we take up in the order presented.

1. *Connection between the Miranda violation and the discovery of the sneakers.*[2] The Commonwealth's suggestion that the defendant's question to the police, asking if they wanted to see the box that contained the paint ball gun he once owned, was a nonresponsive interjection (and therefore attenuated from their custodial interrogation without a Miranda warning) is without merit. Inculpatory statements are deemed a product of custodial interrogation where they are offered in

---

[2]The Commonwealth does not argue in its brief that the judge erred in finding that there was a custodial interrogation of the defendant or that the defendant was properly given his Miranda rights at his home. To the extent we were to consider the question of custody, the Commonwealth would not prevail. See *Commonwealth* v. *Morse*, 427 Mass. 117, 123-124 (1998) (objective standard, not subjective intent, controls on the question of custody). See also *Commonwealth* v. *Sneed*, 56 Mass. App. Ct. 391, 393-394 (2002) (interrogation at home can be custodial).

response to "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Commonwealth* v. *Clark*, 432 Mass. 1, 16 n.9 (2000), quoting from *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). An officer had asked the defendant if he owned a paint ball gun. Here, inasmuch as the police knew that evidence of paint ball use had been found at the crime scene, the inculpatory potential of the question was manifest. That question led directly to the defendant showing the officers to his room. Thus, there was no error in the judge's finding and ruling that the defendant's consent to show the box and to lead the officers into his bedroom where the sneakers and clothing were found was directly caused by the custodial interrogation.

2. *Inevitable discovery.* Evidence need not be excluded under the "fruit of the poisonous tree" doctrine established in *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963), even if the government misconduct was a cause "in fact" of the discovery of the evidence, "if the government obtained the evidence through an independent source, if the connection between the improper conduct and the derivative evidence has become so attenuated as to dissipate the taint, or if the government can demonstrate that the evidence inevitably would have been discovered by lawful means." *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985) (citations omitted). Here, the Commonwealth argues that it would have inevitably discovered the sneakers and clothing by executing the default warrant, taking the defendant into custody and permitting him, while accompanied by the police, to go to his bedroom to get dressed, at which time the police would have seen and seized the items in question.

The Commonwealth did not, however, prove that the police would have executed the default warrant in spite of unlawful questioning. The motion judge found, in substance, that the police had no intent to execute the warrant when they first arrived at the defendant's home, but intended only to use it as a means to gain admission to the home and to conduct an inquiry about the murder, based on their suspicions relating to the defendant's first name and his residence in the neighborhood where the homicide had occurred.

The motion judge further found that the decision to arrest the defendant on the warrant developed as a result of the defendant's answers to the unlawful interrogation. Thus, prior to the unlawful questioning and the information and actions it produced, it was not inevitable that the default warrant would have been executed and that the defendant would have been taken to the bedroom to get dressed.

That the police had the authority to arrest the defendant for disturbing the peace is not sufficient to support a conclusion of inevitable discovery of the challenged evidence. What the police could have done does not determine what they would have done without the unlawfully obtained information. Given the chain of events that actually took place, but omitting the forbidden conduct, the discovery of the sneakers and items of clothing was by no means "virtually certain." If the police had formed an intent to arrest the defendant based on the warrant but simply delayed the execution of that arrest until they could get some useful information out of the defendant, further analysis of the need for the defendant to get dressed and the police to follow him into his bedroom would be required. Here the motion judge found (and the record supports his finding) that the police only decided to execute the warrant on the basis of the illegally obtained evidence.

Without the tainted information, the officers would not have entered the bedroom and seen the incriminating evidence. This is the opposite of the virtual certainty, required under the doctrine of inevitable discovery, that the evidence would have been discovered without the illegal police conduct. See *Commonwealth* v. *DiMarzio*, 436 Mass. 1012, 1013 (2002). *Cf. Commonwealth* v. *Fredette*, 396 Mass. 455, 461-462 (1985); *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117-118 (1989) (where the police had already decided to take the defendant into protective custody, the discovery of drugs on his person was a virtual certainty in view of the inevitable inventory search that would have occurred); *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 698-700 (1998). "It would not be enough to say that the 'inevitability' of discovery is established by proof that, more probably than not, the evidence would ultimately have been found by lawful means. Such a standard dilutes the meaning of

the word 'inevitable.' Once the relevant facts are found by a preponderance of the evidence, the question is whether on those facts discovery by lawful means was certain as a practical matter." *Commonwealth* v. *O'Connor, supra* at 117.

3. *Unambiguous invocation of right to counsel.*[3] The motion judge did not err in concluding that the defendant unambiguously invoked his right to counsel in the circumstances of this case. His choice of words, "I don't think I want to talk to you anymore without a lawyer," taken in the context in which they were spoken, was not a mere "reference to an attorney that is ambiguous and equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking his right to counsel" (emphasis in original). *Commonwealth* v. *Judge,* 420 Mass. 433, 450 (1995). Compare *Commonwealth* v. *Obershaw,* 435 Mass. 794, 800-801 (2002), and cases collected therein.

The Commonwealth does not argue in its brief that it did not reinitiate the interrogation.[4] Although we need not decide the issue, Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), we note that by reinitiating the interrogation after the defendant had invoked his right to counsel, the police violated the rule of *Edwards* v. *Arizona,* 451 U.S. 477, 484 (1981), and the subsequent statements of the defendant were properly suppressed.

> *Order allowing motion to suppress affirmed.*

---

[3]See *Commonwealth* v. *Marquez,* 434 Mass. 370, 378-379 (2001), citing *New York* v. *Harris,* 495 U.S. 14, 19-21 (1990), as to the propriety of admitting the defendant's postarrest statements after he was given and initially waived his Miranda rights at the police station.

[4]The Commonwealth advanced such an argument, unpersuasively, at the hearing.