Nickerson, Gary A., J.
The defendant, Richard Cura, is facing four indictments, 1) rape of a child in three counts, 2) assault and battery, 3) indecent exposure, and 4) indecent assault and battery on a child under the age of fourteen. The indictments arise from an incident on June 20, 2009 at the home in Hyannis where Cura was a boarder. By his motion to suppress, the defendant seeks to preclude the trial jurors from hearing his stationhouse interrogation and confession of June 25, 2009. An evidentiary hearing was conducted on the motion on July 14, 2010. Based on all the credible evidence the court enters the following findings of fact.

FINDINGS OF FACT

On June 23, 2009, officers of the Barnstable Police Department received a report of a recent incident involving two seven-year-old girls at the [H.s’] home in the village of Hyannis. Mrs. H. told the officers that she entered the bedroom of her boarder, the defendant, to find the defendant, her daughter and her daughter’s friend variously half clothed. The girls said the defendant had molested them. Cura was arrested on the 25th, brought to the stationhouse and booked.
The booking officer advised Cura of his rights per Miranda. Upon the completion of the booking Cura was led to an interview room where, at 6:05 p.m., Detective Therese Gallant began a two and a half hour interrogation of Cura. Also present in the room was Officer Matthew Lounsbuiy. The interview was recorded by audio and video means. The recording is of excellent quality (ex. 1).
At the outset Gallant told Cura he was being recorded by audio means. She asked Cura if he knew what that meant. He shook his head no. Gallant explained the recording process. Gallant proceeded to review the Miranda rights with Cura by means of a standard form (ex. 2). She directed Cura to initial each right as she read them. Following Gallant’s recitation of the right to consult with an attorney and to have that attorney present during questioning, Cura paused and asked, “Am I gonna get a lawyer?” the following dialogue ensued:
Gallant: Are you gonna get a lawyer?
Cura: Yes.
Gallant: (pausing for a second or two) When you go over to court, you would be appointed an attorney.
Cura: Oh. (begins initialing)
Gallant: OK? (reading) “If you cannot afford a lawyer, and you want one, a lawyer will be provided for you by the Commonwealth without cost to you.” So there’s your answer. OK? If you cannot afford one, one will be appointed.
Cura: (signing his initials)
Gallant: (reading) “You may also waive your right to counsel, and your right to remain silent, and you may answer any questions or make any statements you wish.”
Cura: What’s, consul, counsel?
Gallant: I’m sorry?
Cura: What’s that, counsel?
Gallant: You may speak to an attorney.
Cura: Oh, ok. (signing his initials)
After Gallant finished reading the Miranda rights, she inquired as to whether Cura understood them. Cura replied that he did. Yet, when Gallant asked Cura what he thought the statements meant, Cura responded, “I dunno.” Gallant then quickly paraphrased the rights, neglecting to mention Cura’s right to remain silent and that anything said can and would be used against him. When Gallant pressed Cura as to whether he now understood the advised rights, Cura replied in the affirmative. Emphasizing that “(this is] the most important part,” Gallant asked Cura to read the waiver paragraph, which Cura did in an unsteady, staccato fashion.[1] The conversation then proceeded as follows:
Gallant: Do you understand that statement?
Cura: (nodding)
Gallant: What does that mean to you?
Cura: That I have my rights. I understand, uh . . . waive.
Gallant: That you understand . . . ?
Cura: Answer the questions.
Gallant: Mm-hm. You understand what your rights are. Correct?
Cura: Yes.
Gallant: OK. This is the part where it says, understanding my rights, OK, the right that I could speak to an attorney, I do not wish to speak to an attorney *318 at this time, and I wish to speak to these officers. Is that what you wish to do?
Cura: Mmm . . . (thinking for a period of approximately ten seconds) Yes.
Gallant asked Cura a series of questions about his education, work history and past living arrangements. By 6:36 p.m., the questioning turned to the events surrounding the alleged sexual assault. Cura expressly denied any wrongdoing, maintaining that the two seven-year-old girls had been in his room playing on his computer when they insisted that Cura play a sex game with them and that one of the girls began taking off her clothes notwithstanding Cura’s protest. Cura’s attempts to self-protect — in particular to justify why his pants were unbuttoned and belt undone when Ms. Hercules pushed her way into the room — were rife with inconsistencies. Gallant asked Cura about his religious beliefs, conveying the notion that lying is sinful.
Each time Cura offered an explanation that patently contradicted one of his earlier responses, Gallant grew visibly more exasperated. Gallant repeatedly challenged Cura in a hostile tone that, “You can’t even keep your stories straight.” Nonetheless, Cura continued to minimize his involvement. On at least four occasions, Gallant made statements insisting that, “There will be no other time [to tell the truth],” and, “This is your last opportunity to tell us what you did. If there’s a reason for it. . . I’d like to know that. And I’m sure the people in court would like to know that.” At various times, Gallant and Lounsbury incredulously asked Cura whether he thought a jury would believe his version of the stoiy, and whether Cura wanted “people” to perceive him as a liar.
At approximately 7:49 p.m., following a remark by Lounsbury that “people are gonna think, might think you’re a really bad person if you don’t explain yourself,” Cura finally confessed that he had inappropriately kissed, touched, and exposed himself to the two girls. The interview ended approximately a half hour later with Cura agreeing that he felt better for telling the truth, conceding that he might have a problem with young girls, and requesting that he receive “some, like, help with counseling or something.”
Cura is 41 years of age. He completed high school as a special needs student. His employment history includes work as a dishwasher, hotel housekeeper, grocery store bagger and most recently as a janitor in a laundromat. While he functions outside an institutional setting he relies on the case management services from the Association for Retarded Citizens for assistance with day to day life skills. His limitations were obvious during the interview. Though he appeared to comprehend the questions, Cura often paused to think before responding; provided terse, relatively uninformative answers; and indicated several times that he could not remember specific details or chronology of events.
The court received and credits the testimony and report (ex. 3) of Dr. Paul G. Nestor, a licensed psychologist who interviewed Cura on two occasions.[2] After conducting a battery of neuropsychological tests, Dr. Nestor determined that Cura possesses a full-scale IQ of 61, which falls in the “Extremely Low” range and ranks Cura in the 0.5th percentile as compared to peers his age. Cura’s test scores indicated significant deficits in verbal comprehension, oral expression, processing and memorization of oral and visual information, and higher-level intellectual thinking and reasoning. Additionally, Dr. Nestor testified that Cura’s reading, spelling, and arithmetic skills are no higher than a third-grade level. Dr. Nestor also noted that the defendant’s receipt of Social Security Disability Insurance (SSDI), need for an ARC caseworker to manage his money, and past use of a “job coach” further demonstrate Cura’s limitations in adaptive functioning. Ultimately, Dr. Nestor concluded that:
Mr. Cura meets [the Diagnostic and Statistical Manual Disorders Text Revision] criteria for 317 Mild Mental Retardation which is defined as a lifelong condition that substantially compromises the development of general intellectual functioning. By reason of his Mild Mental Retardation, Mr. Cura lacked the capacity to intelligently waive his Miranda rights on June 25, 2009. (Ex. 3, p. 12.)
No countervailing expert testimony was offered by the Commonwealth. While Cura has had some prior contact with law enforcement proceedings, the quality of that past history as it may impact the present inquiry was not developed at the hearing.
APPLICATION OF THE FACTS TO THE LAW
For a waiver of Miranda rights to be valid, the Commonwealth must demonstrate beyond a reasonable doubt that a suspect relinquished his rights voluntarily, knowingly, and intelligently. Commonwealth v. Magee, 423 Mass. 381, 386 (1996). A court should consider a nonexhaustive list of factors when evaluating the propriety of a waiver, including “promises or other inducements, conduct of the defendant, the defendant’s age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency.. . and the details of the interrogation, including the recitation of Miranda warnings.” Commonwealth v. Mandile, 397 Mass. 410, 413 (1986); Commonwealth v. St. Peter, 48 Mass.App.Ct. 517, 519-20 (2000). Every reasonable presumption against waiver should be indulged. Commonwealth v. Hooks, 375 Mass. 284, 288 (1978).
A defendant’s illiteracy or low intelligence is not dispositive of his capacity to waive Miranda rights and render a knowing, intelligent, and voluntary confession. See Commonwealth v. Ostrander, 441 Mass. 344, 346, cert. denied, 543 U.S. 867 (2004); Commonwealth v. Jackson, 432 Mass. 82, 86-87 (2000) (concluding *319 that the defendant, who had a learning disability and an IQ in the eighties, validly waived his rights in light of his “considerable prior experience with the police and in receiving Miranda warnings,” as well as his “cunning” attempts to exculpate himself “after being confronted with the [ ] evidence against him”); Commonwealth v. Hartford, 425 Mass. 378, 380-81 (1997) (holding that, irrespective of the suspect’s limited reasoning ability and IQ of 73, evidence that the suspect had held various part-time jobs, had been living on his own, possessed a driver’s license, and had prior experience with law enforcement was probative of competence to waive Miranda rights); Commonwealth v. Dingle, 73 Mass.App.Ct. 274, 285-86 (2008), review denied, 453 Mass. 1102 (2009); Commonwealth v. Wallen, 35 Mass.App.Ct. 915, 917 (1993) (finding that efforts by the defendant to exculpate himself indicated capacity to understand and waive Miranda rights, even where the individual had an IQ ranging between sixty and seventy, had attained only third- or fourth-grade reading and writing levels, and could recognize few words exceeding three syllables).
Massachusetts courts must, however, “scrutinize the record with special care when the suspect has a diminished or subnormal mental capacity.” Commonwealth v. Cameron, 385 Mass. 660, 664 (1982), quoting Commonwealth v. Daniels, 366 Mass. 601, 606 (1975). “Circumstances and techniques of custodial interrogation which pass constitutional muster when applied to an adult of normal intelligence may not be constitutionally tolerable when applied to one who is mentally deficient.” Hartford, supra at 381. The operative focus concerns not whether a suspect appreciated the strategic ramifications of making a confession, but whether the person comprehended the substance of the Miranda warnings themselves. See Commonwealth v. Hilton, 443 Mass. 597, 606 (2005), quoting United States v. Ruiz, 536 U.S. 622, 629 (2002) (“The law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances — even though the defendant may not know the specific detailed consequences of invoking it” (emphasis in original)); Commonwealth v. Lee, 10 Mass.App.Ct. 518, 529-30 (1980).
Significant evidence exists to support a conclusion that Cura lacked the capacity to waive his Miranda rights, ergo the Commonwealth has failed to meet its burden. This court gives “considerable weight” to Cura’s full-scale IQ of 61, dramatically impaired communications skills, and evident difficulties understanding abstract legal concepts. See Hilton, supra at 605-07. According to Dr. Nestor’s report, “Mr. Cura can only process very basic and concrete information presented in small chunks,” and “his intellectual disability allows him only the most basic, instrumental, concrete understanding of the world.” (Ex. 3, p. 11.) Nothing on the interview tape suggests Cura understood the substantive import of each Miranda right, a prerequisite to making a valid waiver. When prompted by Gallant, Cura could not explain the gist of the rights read to him; more significantly, Cura seemingly interpreted the waiver paragraph to mean that he had no choice but to “answer the questions.”
The Commonwealth points out that Cura adequately answered Gallant’s questions with respect to his biographical information and background. Even then, however, Cura spoke in a less-than-confident manner, often stumbling to find the right vocabulary and pausing to think about his responses. Contrast Commonwealth v. Davis, 380 Mass. 1, 4-6 (1980) (affirming that an illiterate suspect with an IQ of 79 made a knowing waiver of Miranda rights where his answers were “responsive, clear, lucid, and ready”; “(n]o remark or response . . . [was] found to be confused [or] incoherent”; and the suspect “was told three or four times during the session that he could stop the questioning at will”).
Cura’s comparative lack of self-sufficiency is suggestive of his incapacity to execute a knowing, intelligent, and voluntary waiver of Miranda rights. Specifically, Cura required assistance from an ARC caseworker in managing his money, had previously enlisted the help of a job coach, and apparently had no independent means of transportation. Cura stated that he attended classes in high school for students with learning disabilities, and, despite his steady employment history, all of Cura’s positions involved low-level service-industry work. Contrast with Jackson, supra at 86-87 (reiterating that a suspect who was found to be “well aware of the possible consequences of waiving his rights and speaking to the police” had gone to public schools, where he spent the majority of time in regular classrooms; had never been diagnosed as retarded; and had successfully held at least three full-time jobs during his lifetime).
Finally, Cura’s blaming of the two seven-year-old girls and his offering of inherently conflicting accounts of the events surrounding the alleged sexual assault hardly constitute sophisticated attempts at self-protection. The facts of this case strikingly resemble those of Commonwealth v. Stazinski, 2007 WL 2938349, *1 (Mass.Super. 2007) [23 Conn. L. Rptr. 157], where the court concluded that, “[A]lthough it is a close factual issue, [the defendant] had such a low level of mental functioning that he did not understand some of the warnings themselves and therefore did not knowingly and voluntarily waive his Miranda rights.” In Stazinski, the defendant possessed a verbal IQ of approximately 72 at the time of interrogation, exhibited “the characteristics of one who suffers from mental retardation,” and, like Cura, had made childlike efforts to exculpate himself.[3] Id. at *4. The suspect in Stazinski responded in the affirmative when asked whether he understood his Miranda rights and wished *320 to speak with the police without the aid of an attorney — responses that the court held to be mere reflexes, rather than indicia of a valid waiver. Id.
In the context of an individual diagnosed with Mild Mental Retardation, the question “Am I gonna get a lawyer?” represents a proper invocation of the suspect’s right to counsel. It is axiomatic that a person subjected to custodial interrogation may assert his desire to speak to an attorney at any time prior to or during questioning, and that the police must scrupulously honor such a request by halting all questioning until counsel is present. Commonwealth v. Obershaw, 435 Mass. 794, 800 (2002), citing Miranda v. Arizona, 384 U.S. 436, 474 (1966); Commonwealth v. Brant, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). Any statements obtained in violation of this precept are presumed involuntary, unless the suspect himself initiates further communication, exchanges, or conversations with the authorities. Commonwealth v. Judge, 420 Mass. 433, 448-49 (1995), citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), and McNeil v. Wisconsin, 501 U.S. 171, 177 (1991). The Commonwealth bears the burden of establishing beyond a reasonable doubt that “subsequent events indicated a voluntary, knowing, and intelligent waiver of the right to have counsel present.” Commonwealth v. Rankins, 429 Mass. 470, 473 (1999).
Despite this prophylactic protection, Massachusetts courts have long held that a suspect must express a clear unwillingness to continue the interview or make an unequivocal request for an attorney in order to trigger the mandatory termination of questioning. See Commonwealth v. Auclair, 444 Mass. 348, 356-57 (2005) (holding that a defendant’s assertion, “I’ll get a lawyer,” did not amount to an affirmative request, but rather a recognition of the severity of the charges alleged and that the police suspected the defendant to be lying); Commonwealth v. Contos, 435 Mass. 19, 29 (2001) (noting that, in normal parlance, “I think I’m going to get a lawyer” constitutes an affirmative request for the assistance of an attorney); Commonwealth v. Corriveau, 396 Mass. 319, 331 (1985) (concluding that a suspect did not invoke his right to counsel with the remark, “It’s beginning to sound like I need a lawyer”); Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984) (finding that, “I guess I’ll have to have a lawyer for this,” was not an unambiguous request for an attorney); Commonwealth v. Barros, 56 Mass.App.Ct. 675, 681 (2002) (holding that a suspect made an acceptable request for counsel by stating, “I don’t think I want to talk to you anymore without a lawyer”). Neither “a mere inquiry regarding the need for an attorney” nor “wondering] aloud about the advisability of having a lawyer” suffices as a clear and unequivocal invocation of a suspect’s right to counsel. Commonwealth v. Scoggins, 439 Mass. 571, 575 (2003); Commonwealth v. Todd, 408 Mass. 724, 726 (1990).
Even where an individual makes a purportedly ambiguous request, “in ordinary circumstances, there [is] no proper basis for an interrogator’s asking a suspect his reason for requesting an attorney (emphasis supplied).” Commonwealth v. Sarourt Nom, 426 Mass. 152, 158 (1997). However, both the United States Supreme Court and the Massachusetts Supreme Judicial Court have recognized that it is “good police practice” for an interviewing officer to seek clarification as to whether the suspect wishes to consult with counsel. Commonwealth v. Morganti, 455 Mass. 388, 398 n.6 (2009), quoting Davis v. United States, 512 U.S. 452, 461 (1994).
This court concludes that “Am I gonna get a lawyer?" constituted an unequivocal expression of Cura’s desire to have the assistance of an attorney during the ensuing police interview. The question represented more than a mere reference to counsel, or Cura musing aloud about the possibility of getting a lawyer. As the interview tape makes evident and as Dr. Nestor testified, Cura’s severely limited intellectual abilities precluded him from stringing together a sophisticated sentence that might have better conveyed his wishes. Gallant was well aware of Cura’s limitations. Her response to Cura’s “Am I gonna get a lawyer?” was to tell him one would be appointed to him when he went to court. Gallant took Cura’s concrete, in the present concern for having a lawyer, as his concern about having a lawyer for future proceedings. Whether she acted inadvertently or not, she inappropriately glossed over Cura’s concern, utterly failing to address his desire with the care required given his limited intellect.
Given Cura’s manifest lack of understanding about his Miranda rights, Cura’s choice of words — "Am I gonna get a lawyer?" — is an “acceptable and reasonable way to frame a request” for counsel. See Contos, supra at 29, quoting State v. Dumas, 750 A.2d 420, 425 (R.I. 2000) (concluding that, in view of the authorities’ response and any further utterances by the suspect, “Can I get a lawyer?” could constitute an unequivocal invocation of the right to counsel). Rather than attempting to resolve any uncertainty surrounding Cura’s question, Gallant responded with an arguably misleading statement indicating that Cura would receive an attorney upon his appearance in court. Contrast Commonwealth v. Grenier, 415 Mass. 680, 683-84 (1993) (declaring that, where a suspect had asked about the meaning of the Miranda provision that anything said might be used against him, nothing in the police officer’s answer was erroneous, deceptive, or indicative of trickeiy so as to suggest involuntariness of the subsequent inculpatory statements).
In Jones, supra at 258-59, the defendant sought to suppress incriminating statements on grounds that the police inspector’s response to his request for an attorney had confused him, thereby preventing the Commonwealth from establishing an effective waiver of the defendant’s right to counsel. Notwithstanding *321 the defendant’s asserted low intelligence, sparse education, and inexperience with the criminal justice system, the Massachusetts Supreme Judicial Court agreed that “the defendant’s statement that he was ‘going to need a lawyer sometime,’ together with his refusal to pursue [the inspector’s] statement that he was entitled to a lawyer, and that the State would pay for one,[4] did not constitute an affirmative request for an attorney.” Id., at 258.
Unlike in Jones, Gallant—whether advertently or inadvertently—misled Cura with respect to his Miranda right to counsel, suggesting that Cura’s first opportunity to procure an attorney would occur at the court house.[5] Under the totality of the circumstances, this court determines that Cura did not comprehend his entitlement to counsel and that the Commonwealth has failed to meet its heavy burden of establishing Cura waived that Miranda right beyond a reasonable doubt. See Commonwealth v. Murray, 359 Mass. 541, 546 (1971); also see Commonwealth v. Lopes, 455 Mass. 147, 163 n.15 (2009) (emphasizing that “the invocation of the right to counsel must be more scrupulously honored than the invocation of the right to silence”).

ORDER

For the above stated reasons it is ORDERED that the defendant’s Motion To Suppress Statements be ALLOWED.

 The interrogation tape reflects Cura apparently stumbling to sound out a few words, including “voluntarily”; skipping over the word “intelligently”; and dipping into an inaudible whisper, forcing Gallant to instruct him to speak louder on at least one occasion.

 A motion judge retains discretion to accept or reject expert testimony regarding a defendant’s mental deficiencies and their bearing upon the validity of a Miranda waiver and voluntariness of a confession. See Commonwealth v. Tolan, 453 Mass. 634, 644 (2009).

 The court focused upon other facts in Stazinski, many of which parallel the evidence in Cura’s case. For example, the defendant had the intellectual functioning of a seven- or eight-year-old child; the defendant’s mental deficits had prevented him from ever advancing beyond menial job positions (e.g. Burger King custodian, theater worker, handyman, floor washer); the defendant had difficulty understanding basic concepts, including simple mathematical calculations; the defendant’s responses during the interrogation were “short and lacking much detail”; and the defendant had very limited experience with the criminal justice system arising out of one arrest ten years prior. Stazinski, supra at *2, *4.

 The inspector testified that he explicitly told the defendant: “There’s an assistant district attorney right down the hall. lean go and get himforyou, and he will getyou a lawyer,” and, “There’s a D.A. right down the hall. We can get you a lawyer if you want one and it will be provided for you under your constitutional rights.” Jones, supra at 256 n.4.

 In the context of explaining Cura’s Miranda rights anew, Gallant did make two statements accurately conveying Cura’s ability to speak with an attorney at that time and prior to any police questioning. Nonetheless, given Gallant’s previous inconsistent characterization and the rapid pace with which Gallant reviewed the Miranda rights after Cura expressed confusion about them, this court finds these curative remarks insufficient.