COMMONWEALTH vs. KNOWELL GREENWOOD.[1]

No. 09-P-379.

Suffolk. June 15, 2010. - January 20, 2011.

Present: McHUGH, MILLS, & GRAINGER, JJ.

*Kidnapping. Breaking and Entering. Robbery. Practice, Criminal,* Motion to suppress, Identification of defendant in courtroom, Harmless error. *Search and Seizure,* Threshold police inquiry, Protective frisk, Reasonable suspicion, Search incident to lawful arrest. *Constitutional Law,* Investigatory stop, Identification. *Error, Harmless.*

A Superior Court judge erred in denying a criminal defendant's pretrial motion to suppress a showup identification that was conducted on the basis of information yielded by the search of a purse, book bag, and cooler in the defendant's possession, where, although the judge correctly ruled that police officers' initial stop of a vehicle in which the defendant was a passenger and the officers' subsequent exit order were justified by a reasonable suspicion of criminal activity [616], the patfrisk and search that followed (and led to the showup identification) were not justified, given that the purpose of the search was not to find weapons, and given that the officers lacked any reasonable belief the defendant was armed and dangerous [616-617], and where the search was not conducted incident to a lawful arrest, given that the police lacked probable cause to arrest [617-619]; therefore, the evidence flowing from the information obtained from the unlawful search was the fruit of a poisonous tree [619].

At a criminal trial, the judge properly admitted the victim's in-court identification of the defendant, following a prior identification by the victim that was required to be suppressed, where the evidence clearly and convincingly established that the in-court identification had an independent origin, i.e., the victim's recollection of his mental composite image of his assailant based on his observations at the time of the robbery [619-621]; and where the in-court identification was not required to be suppressed as the fruit of the unlawful search that led to the prior identification, given that the victim's identity was not undiscoverable but for the unlawful search, and his recognition of his assailant in court was therefore not an event made possible only by the unlawful search [621-622].

At a criminal trial, the erroneous admission of evidence that was the fruit of an unlawful search was harmless beyond a reasonable doubt, where the admissible evidence relating to identification, on which the defense was exclusively based, was overwhelming. [622-623]

There was no merit to a criminal defendant's claim that his convictions were duplicative. [623-624]

---

[1]The indictments indicate that the defendant is also known as Robert Markes.

INDICTMENTS found and returned in the Superior Court Department on February 23, 2005.

A pretrial motion to suppress evidence was heard by *Frank M. Gaziano*, J., and the cases were tried before him.

*Dale M. Merrill* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

GRAINGER, J. The defendant, Knowell Greenwood, was indicted on five counts, among them kidnapping, G. L. c. 265, § 26; breaking and entering, G. L. c. 266, § 17; and armed robbery, G. L. c. 265, § 17, all as a habitual offender.[2] Prior to trial, he filed a motion to suppress a pretrial identification. He also filed a motion to suppress an in-court identification. The trial judge denied both motions, and the Commonwealth introduced the contested evidence at trial. A jury convicted the defendant of kidnapping, breaking and entering, and the lesser included offense of unarmed robbery. On appeal, the defendant raises numerous claims of error, including the denial of his pretrial motions to suppress. Because we conclude that the arresting officers' initial search of the defendant's possessions was not supported by probable cause, but that the admission of the resulting fruits at trial was harmless beyond a reasonable doubt, and we reject the defendant's other claims of error, we affirm the judgments of conviction.

*Background.* We summarize the relevant facts from the motion judge's findings, supplemented as necessary with uncontested facts from the motion hearings.[3] See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007) (*Isaiah I. [No. 1]*), S.C. 450 Mass. 818 (2008) (*Isaiah I. [No. 2]*). At approximately 11:30 A.M. on October 9, 2004, a dispatcher for the Boston police department received a call from a resident of 1396

---

[2]The Commonwealth also indicted the defendant on counts of assault and battery, G. L. c. 265, § 13A, and assault and battery with a dangerous weapon, G. L. c. 265, § 15A. However, at trial the Commonwealth filed motions to nol pros these counts, as well as the habitual offender portions of the remaining counts.

[3]The evidence at the first suppression hearing (January 10, 2006) consisted of the testimony of Officer Charles Blicker of the Boston police department and the 911 recording of the resident's complaint on October 9, 2004. The evidence at the second suppression hearing (January 31, 2006) consisted of testimony from Officer Antonio DiMaggio, Officer Steven Charbonnier, and the victim, as well as transcripts of grand jury testimony.

Dorchester Avenue, who reported that two large black males were banging on doors in his building. Officers Charles Blicker and Patrick Murphy responded to the scene in an unmarked police cruiser, which they parked roughly fifty feet from the apartment building's front entrance. Proceeding to the second floor to speak with the caller, the officers observed several objects — specifically, a black book bag and a paper bag containing a partially filled bottle of beer — in the second-floor hallway outside the caller's apartment. The officers spoke with the caller, who reiterated his initial report to the officers, adding that one of the two individuals — neither of whom he recognized — had braided hair. He also disclaimed ownership of the items discovered in the hallway, indicating that they had appeared only recently.

Officers Blicker and Murphy canvassed the building's four floors in search of any suspicious persons. Failing to observe any suspicious activity or individuals during the course of their search, the officers exited the building from the rear. En route to their cruiser via the side of the building, they observed several pieces of broken glass on the ground, which Officer Blicker determined to have originated from a shattered window on the building's third floor. Discerning no need to investigate further, the officers continued toward their cruiser intending to survey the building's front entrance for several minutes before clearing the call.

Moments before entering the cruiser, Officer Blicker spotted a black male with braids, subsequently identified as the defendant, exiting the building via the front entrance. The defendant was carrying the black book bag and beer bottle previously observed by the officers in the hallway. Also in his possession were a cooler bag and a woman's beige purse. Walking into the middle of Dorchester Avenue, the defendant immediately waved down a Pontiac Grand Am automobile. After engaging the driver in a brief conversation, the defendant entered the vehicle on the passenger side. Officers Blicker and Murphy immediately entered their cruiser, activated their lights, and pursued the vehicle, pulling it over within one hundred feet of the apartment building.

With Officer Murphy serving as backup, Officer Blicker approached the vehicle and questioned the driver, who maintained

that he was not familiar with the defendant and was merely giving him a ride to a nearby location. Satisfied with the driver's explanation, Officer Blicker turned his attention to the defendant, whom he immediately removed from the vehicle. He pat frisked the defendant and, once satisfied that the defendant was not armed, questioned him concerning his activities at 1396 Dorchester Avenue. Receiving an unintelligible answer from the defendant, who appeared slightly inebriated, the officers then sought to determine ownership of the purse in the defendant's possession. The defendant asserted that the purse belonged to his grandmother, providing her name to the officers. Unconvinced by this explanation, Officer Blicker retrieved the purse and opened it to test the defendant's explanation. Among the items discovered in the purse was a prescription pill bottle bearing the victim's name and listing his address as 1396 Dorchester Avenue. Based on this discovery, Officer Blicker handcuffed the defendant pending further investigation.

At this point, Officer Antonio DiMaggio arrived on the scene. Conducting a cursory search of the black book bag, Officer DiMaggio found several additional prescription pill bottles bearing the victim's name and the 1396 Dorchester Avenue address. Receiving no answers from the defendant regarding ownership of the bottles, Officer DiMaggio proceeded to the apartment in search of a potential victim. Upon arriving at the apartment and discovering the door ajar, Officer DiMaggio entered with his gun drawn to conduct a protective sweep. Once inside, he encountered the victim, who appeared disheveled and informed Officer DiMaggio that he had just been robbed, describing his assailant as a black male with "dread locks."[4] He further stated that the robber had choked him and placed him in a closet during the course of the robbery, threatening to kill him if he emerged. He also stated that he had attempted to contact the police once the robber fled the scene, but found that his telephone wires had been ripped out of the wall.

After taking the victim's statement, Officer DiMaggio informed

---

[4]The motion judge concluded that the victim's uncertainty regarding whether the defendant had "curls," "dread locks," or "corn rows" was a product of his unfamiliarity with the terminology for current hair styles, not a reflection on his ability to observe the defendant's features.

him that the police had a suspect in custody at a nearby store. Within approximately fifteen minutes of the defendant's initial detainment, officers transported the victim to that store to conduct a showup identification. Observing the defendant as he exited one of several cruisers in the parking lot, the victim immediately recognized the defendant as the robber, providing a positive identification to the police. He also subsequently identified several items in the defendant's possession, including house keys and prescription pill bottles, as his belongings.

Reasoning that the police "did not exceed the permissible scope of a threshold inquiry," the motion judge found the search of the purse and the defendant's subsequent detainment to be reasonable extensions of the initial stop. He further concluded that, in light of the alleged "violent home invasion" and "in the interest of public safety," the showup identification was necessary, and that nothing in the facts "indicate[d] that the manner in which this particular showup was conducted was unnecessarily or impermissibly suggestive." Accordingly, the judge denied the defendant's motions to suppress and found the showup identification — and, by extension, any future in-court identification — to be admissible.

*Discussion.* 1. *Claims based on pretrial motions to suppress.* Both motions to suppress are directed to the initial detention of the defendant immediately after the robbery. The defendant contends that the police lacked reasonable suspicion for the initial stop and possessed no probable cause to search the purse, book bag, or cooler bag. Therefore, he asserts, all the evidence subsequently obtained, including the victim's showup and in-court identifications of the defendant, and moreover the victim's in-court testimony identifying the items stolen from him,[5] was the product of an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. When reviewing a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error. *Isaiah I. (No. 2)*, 450 Mass. at 821. "Our review of the application of constitutional principles to those facts, however, is plenary." *Commonwealth* v. *Watts*, 74

---

[5]These were also introduced as trial exhibits.

Mass. App. Ct. 514, 516-517 (2009), quoting from *Commonwealth v. Kaupp*, 453 Mass. 102, 105 (2009).

a. *Initial stop and exit order.* We agree that Officers Blicker and Murphy possessed a reasonable suspicion of criminal activity sufficient to justify their initial stop of the vehicle and exit order to its occupants. Where police officers have a reasonable, articulable suspicion that a person in a vehicle has committed, is committing, or is about to commit a crime, they may stop that vehicle, issue an exit order, and conduct a threshold inquiry. *Commonwealth v. Bostock*, 450 Mass. 616, 619 (2008), citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Though the officers were admittedly uncertain that a specific crime had occurred, their observations to that point were sufficient to raise a reasonable suspicion of criminal activity. It is well established that otherwise innocent conduct, when considered in the aggregate, can give rise to reasonable suspicion. *Isaiah I. (No. 2), supra* at 823. *Commonwealth v. Pagan*, 63 Mass. App. Ct. 780, 782-783 (2005). Here, the defendant matched the caller's general description of the suspicious individual banging on doors. The responding officers first observed him in possession of the black book bag and paper bag seen minutes earlier in the hallway outside the caller's apartment, as well as what Officer Blicker described as a lady's purse. Upon exiting the building, the defendant immediately proceeded to hail an oncoming vehicle, conduct consistent with an attempt to flee the scene. In light of these specific, articulable facts, the judge correctly ruled that the officer's initial stop was justified.

b. *Patfrisk and search.* Less certain is the propriety of the officers' subsequent patfrisk and search of the purse, book bag, and cooler bag. While we concur that the vehicle stop and exit order were justified by the officers' reasonable suspicion of criminal activity, see *Bostock, supra* at 619-622 (vehicle stop and exit order may be based on reasonable belief of criminal activity), we are not persuaded that the patfrisk and search were permissible under the circumstances. A *Terry*-type patfrisk and search, see *Terry, supra* at 23-27, may be performed only where an officer reasonably believes that the defendant is armed and dangerous. See *Commonwealth v. Gomes*, 453 Mass. 506, 512 (2009). See also *Commonwealth v. Pagan*, 440 Mass. 62, 68-69

(2003). "While the officer need not be absolutely certain that the individual is armed, the basis for his acts must lie in a reasonable belief that his safety or that of others is at stake." *Gomes, supra,* quoting from *Commonwealth* v. *Silva,* 366 Mass. 402, 406 (1974). "[A] search for evidence as opposed to weapons is not authorized by *Terry* principles." *Commonwealth* v. *Santos,* 65 Mass. App. Ct. 122, 125 (2005), and cases cited. Officer Blicker's hearing testimony established that, throughout the course of the investigative stop, the defendant acted in a cooperative manner. He made no furtive gestures, was not hostile towards the officers, and did not attempt to flee. When coupled with the officers' uncertainty regarding the precise nature of the criminal activity afoot, these facts do not give rise to an articulable risk to officer safety.

Officer Blicker admittedly opened the purse in the conscientious exercise of his duties to ascertain the veracity of the defendant's responses to his questioning. At no point was it his intention to search the purse for weapons. Nor would such an intrusion have been justified in light of our conclusion that the officers lacked any reasonable belief that the defendant was armed and dangerous.

The searches are likewise not sustainable on the alternate ground that they were incident to a lawful arrest. The Fourth Amendment and art. 14 permit a search of a defendant's person and the area within his immediate control when conducted contemporaneously and incident to a lawful arrest. *Commonwealth* v. *Netto,* 438 Mass. 686, 696 (2003), citing *Commonwealth* v. *Madera,* 402 Mass. 156, 160-161 (1988). The search may precede the formal arrest so long as probable cause to arrest exists independently of the results of the search, *Commonwealth* v. *Washington,* 449 Mass. 476, 481 (2007), and where there is also probable cause to believe that the object searched contains evidence of the crime for which the defendant is being arrested. *Netto, supra.* "[P]robable cause exists where . . . the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual . . . has committed or was committing an offense." *Commonwealth* v. *Santaliz,* 413 Mass. 238, 241 (1992), quoting from *Commonwealth* v. *Storey,* 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980). The

investigating officer "must have entertained rationally 'more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime . . . .' " *Santaliz, supra,* quoting from *Commonwealth* v. *Rivera,* 27 Mass. App. Ct. 41, 45 (1989).

Although the question is a close one, we are constrained to conclude that the police lacked probable cause to arrest the defendant. The initial stop of the vehicle was based primarily on the officers' belief that the defendant matched the vague description provided by the initial call, and his possession of a woman's purse. The officers lacked any concrete knowledge that a crime had been committed. Their observations to that point justified nothing more than the initiation of a threshold inquiry. Compare *Commonwealth* v. *Cheek,* 413 Mass. 492, 496 (1992) (no reasonable suspicion where defendant matched description of "black male with a black 3/4 length goose [down jacket]" and was observed in close proximity to reported stabbing in high crime area), and *Commonwealth* v. *Acevedo,* 73 Mass. App. Ct. 453, 458 (2009) (reasonable suspicion where suspects observed in close proximity to scene of armed robbery within minutes of report, one suspect was wearing white sneakers matching description of perpetrators, and suspects were only persons who generally fit description of perpetrators), with *Bostock,* 450 Mass. at 624-625 (probable cause where defendant observed in vicinity of reported criminal activity within minutes of the crimes, matched descriptions provided by multiple witnesses, and provided implausible answers to police questioning). Although the defendant's subsequent responses to Officer Blicker's questions heightened the officer's suspicion, they did not suffice to elevate that suspicion to probable cause. The defendant's justification for his possession of the purse, while suspect, was not wholly implausible, particularly in light of the absence at that point in time of any report of theft at 1396 Dorchester Avenue. See *Commonwealth* v. *Watson,* 430 Mass. 725, 733-734 (2000), quoting from *Commonwealth* v. *Riggins,* 366 Mass. 81, 88 (1974) ("[i]mplausible answers to police questions will, with other facts, support a finding of probable cause to conduct a search . . ."). Though under the circumstances the police conduct was far from egregious, the fact remains that the officers harbored nothing

more than a reasonable suspicion of criminal involvement; thus, the decision to open the purse, the black book bag, and the cooler bag was improper under our cases. See *Commonwealth* v. *Levy*, 76 Mass. App. Ct. 617, 621 (2010). Accordingly, the contents of these bags must be suppressed.

c. *Showup identification.* It is uncontested that the police used information obtained from the search of the purse, book bag, and cooler to locate the victim and conduct a showup identification. As those searches were unlawful, the evidence flowing from the information obtained from them, including the contact with the victim and the subsequent showup identification, was the fruit of a poisonous tree and must also be suppressed.[6] See *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963).

d. *In-court identification.* The defendant challenges the victim's in-court identification on two grounds. He contends (1) that the in-court identification was tainted by the prior showup identification, which he contends was unnecessarily suggestive, and (2) that, even if the victim identified him at trial based on an

---

[6]Though the Commonwealth failed to raise the issue on appeal, we briefly consider the admissibility of the showup identification pursuant to the inevitable discovery exception to the exclusionary rule. For the principle of inevitable discovery to apply, the Commonwealth must prove "the facts bearing on inevitability by a preponderance of the evidence and, once the relevant facts have been proved, that discovery by lawful means was 'certain as a practical matter.' " *Commonwealth* v. *McAfee*, 63 Mass. App. Ct. 467, 479 (2005), quoting from *Commonwealth* v. *Perrot*, 407 Mass. 539, 547 (1990). "The certainty of discovery must exist at the time of the unlawful seizure, not develop as a result of circumstances occurring thereafter." *Commonwealth* v. *Ilges*, 64 Mass. App. Ct. 503, 514 (2005) (citation omitted). While it appears certain that the victim, who had already tried to contact the police to report the robbery, would have done so at some point after the robbery, it is less clear that, absent the illegal search, the defendant would still have been in police custody. Prior to the illegal searches, Officer Blicker lacked any justification to prolong his threshold inquiry and detention of the defendant. See *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 71 (2004) ("When a detention follows from a threshold inquiry that does not reveal further suspicious activity or circumstances, that detention will normally be invalid"), and cases cited. "It [is not] enough to say that the 'inevitability' of discovery is established by proof that, more probably than not, the evidence would ultimately have been found by lawful means." *Commonwealth* v. *Barros*, 56 Mass. App. Ct. 675, 680 (2002), quoting from *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989). The showup identification, which was able to be conducted immediately after the robbery only as a result of the unlawful searches, must therefore be suppressed.

independent recollection of the robbery, the in-court identification must be suppressed as fruit of the poisonous tree. We consider each argument in turn.

(i) *Taint.* For the reasons elaborated below, we conclude from this record that the victim's in-court identification of the defendant was grounded in an independent source, namely the victim's close and sustained observation of the defendant during the course of the robbery — prior to any unlawful police conduct.

Where a prior identification is deemed unnecessarily suggestive, a subsequent identification is admissible at trial only where the Commonwealth can "establish[] by 'clear and convincing evidence' that the proffered identification has a source independent of the suggestive confrontation." *Commonwealth* v. *Botelho,* 369 Mass. 860, 868 (1976), quoting from *United States* v. *Wade,* 388 U.S. 218, 240 (1967), and cases cited. In considering whether an independent source exists, a judge may consider several factors, including "[t]he extent of the witness' opportunity to observe the defendant at the time of the crime . . . and [] the lapse of time between the crime and the identification." *Commonwealth* v. *Johnson,* 420 Mass. 458, 464 (1995), quoting from *Botelho, supra* at 869. The analysis is contextual, however, and not every factor is entitled to equal weight. See *Commonwealth* v. *Ross,* 361 Mass. 665, 671 (1972). Moreover, "[i]f greater weight is given to any single factor, [t]he extent of the witness' opportunity to observe the defendant at the time of the crime . . . seems the most important. Clearly the firmer the contemporaneous impression, the less is the witness subject to be influenced by subsequent events." *Id.* at 671-672 (quotations and citation omitted).

Here, the victim had ample opportunity to form a contemporaneous image of his assailant. At trial, the victim testified to having a clear view of the assailant when he first entered the apartment. The assailant's "face was right in [his] face" and the victim "was looking right at [the assailant]" as he pushed the victim down the hallway, approximately "fifteen [to] twenty feet." The victim's opportunity to observe the assailant continued uninterrupted for approximately ten minutes before he was imprisoned in the bedroom closet. Although lacking a robust amount of detail, the portrayal of his assailant as a "black male . . . about 5' 9 or so [with] braids in his hair" accurately described the defendant. It

Commonwealth *v.* Greenwood.

follows that, based upon his observations at the time of the robbery, the victim formed a mental composite of his assailant and that he recalled this image at trial in order to identify the defendant. Thus, we conclude that the evidence clearly and convincingly establishes that the victim's in-court identification had an origin independent of the showup identification.

(ii) *Fruit of the poisonous tree.* The defendant also contends that, even if the victim identified him at trial based on an independent recollection of the robbery, the in-court identification must be suppressed as the fruit of the poisonous tree.[7] Application of the exclusionary rule to an in-court identification is rare, in part because it requires a demonstration that "the challenged evidence is in some sense the *product* of illegal government activity." *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 464 (1986), quoting from *United States* v. *Crews*, 445 U.S. 463, 471 (1980) (emphasis supplied).[8] Nevertheless, in-court identifications will be suppressed where either the physical presence of the witness in court or the witness's basis of knowledge for the identification were procured in violation of the defendant's Fourth Amendment rights. See, e.g., *Crowe*, *supra* at 463-464. Here, though the victim's initial attempt to contact the police was thwarted by the defendant's severance of the victim's telephone wires, the record clearly reflects his intention to notify the authorities. Contrary to the defendant's contention, the victim's identity was not undiscoverable but for the unlawful search. Therefore, likewise, the victim's recognition of his assailant in court was not an event that was made possible only by the unlawful search. See *Crews*, *supra* at 472-473. Although

---

[7]"[T]he 'independent source' test of [*Wade*, 388 U.S. at 241], . . . although derived from an identical formulation in *Wong Sun*, see 388 U.S. at 241, seeks only to determine whether the in-court identification is sufficiently reliable to satisfy due process, and is thus inapplicable in the context of [a] Fourth Amendment violation." *United States* v. *Crews*, 455 U.S. 463, 473 n.19 (1980). Accordingly, "a satisfactory resolution of the reliability issue does not provide a complete answer to the considerations underlying *Wong Sun* . . . ." *Ibid.*

[8]We emphasize that no evidentiary value may be assigned to the consistency of the in-court identification with the showup identification, as such an assignation "would undermine the exclusionary rule's objectives in denying the Government the benefit of any evidence wrongfully obtained." *Crews*, *supra* at 473 n.18.

the presence at trial of the defendant himself was a product of the unlawful seizure, the defendant "is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." *Id.* at 474. See *Commonwealth* v. *Jacobsen*, 419 Mass. 269, 275 n.6 (1995), quoting from *Crews*, *supra* at 474 n.10 ("Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book"). Accordingly, "the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned." *Crews*, *supra* at 472.

e. *Harmless error.* Having concluded that numerous pieces of evidence were the fruit of an unlawful search and seizure and should therefore have been suppressed, we must now determine whether their erroneous admission was "harmless beyond a reasonable doubt." *Commonwealth* v. *Tyree*, 455 Mass. 676, 700 (2010), quoting from *Chapman* v. *California*, 386 U.S. 18, 24 (1967), and cases cited. When undertaking this analysis the essential question is "whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000), quoting from *Chapman*, *supra*. "The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error." *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445-446 (1983), quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 765 (1946). "[I]t is not enough for the Commonwealth to demonstrate that its other, properly admitted evidence was 'sufficient' to convict the defendant or that the inadmissible evidence was 'consistent' with the admissible evidence." *Tyree*, *supra* at 701, quoting from *Commonwealth* v. *Dagraca*, 447 Mass. 546, 554-555 (2006).[9]

The crux of the defense was misidentification; the Com-

---

[9]Other factors considered include the importance of the evidence to the

monwealth's case can be characterized as very strong, tainted evidence notwithstanding. Officer Blicker testified to observing the defendant at the scene of the crime, in possession of a woman's purse that the victim subsequently identified as belonging to his wife. The defendant appeared to be fleeing the scene, and he could not justify his presence at 1396 Dorchester Avenue when confronted by police. Most damning by far is the testimony of the victim, who recounted the robbery and attack in detail, and identified the defendant with certainty at trial as his assailant. Our task is to determine whether this evidence was sufficiently "powerful as to neutralize the erroneously admitted" evidence. *Dagraca, supra* at 555 (citations omitted).

We conclude that the victim's detailed and unrefuted testimony, his identification of his attacker and of his wife's purse, which was found in the defendant's possession by the officers, renders the inadmissible evidence harmless beyond a reasonable doubt. Simply stated, the admissible evidence relating to identification, on which the defense was exclusively based, was overwhelming. It was so powerful that it neutralized the tainted evidence, which was no more than duplicative on this issue. Accordingly, the admission in evidence of the showup identification and other fruits was harmless beyond a reasonable doubt.

2. *Additional claims.* We note that the defendant's assertion of duplicative convictions is baseless. Massachusetts recognizes an elements-based approach to the doctrine of merger, whereby "a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element the other does not." *Commonwealth* v. *Vick*, 454 Mass. 418, 431 (2009), quoting from *Commonwealth* v. *Valliere*, 437 Mass. 366, 371 (2002). When applying this rule, the actual criminal acts charged are wholly irrelevant; rather, we consider the elements objectively, abstracted from the facts of the particular case before us. *Commonwealth* v. *Jones*, 441 Mass. 73, 76 (2004). Kidnapping requires the Commonwealth to prove that the defendant, without lawful authority, forcibly or

prosecution's case, the relationship between the evidence and the premise of the defense, and the frequency of the reference. *Dagraca, supra* at 553. However, these factors, while useful, are not exclusive or exhaustive. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 697 (1983); *Tyree, supra* at 701.

secretly confined the victim within the Commonwealth against his will. See G. L. c. 265, § 26. Robbery requires the Commonwealth to prove that the defendant stole or took the personal property of another by force and violence, or by assault and putting in fear. See *Commonwealth* v. *Christian*, 430 Mass. 552, 556 (2000). See also G. L. c. 265, § 19. Each offense contains elements that the other does not, and neither crime is a lesser included offense of the other. We conclude that the defendant's multiple convictions were not duplicative.

To the extent that we do not address the defendant's other contentions, "they 'have not been overlooked. We find nothing in them that requires discussion.' " *Department of Rev.* v. *Ryan R.*, 62 Mass. App. Ct. 380, 389 (2004), quoting from *Commonwealth* v. *Domanski*, 332 Mass. 66, 78 (1954).[10]

*Judgments affirmed.*

---

[10]The defendant's additional claims include error in the prosecutor's closing and the phrasing of the victim's testimony. A careful review of the record reveals neither material error nor prejudice to the defendant. The defendant also addresses the loss of certain evidence (now suppressed in any event) by the Commonwealth.